[No. 37508.   En Banc.   February 23, 1967.]

PHILIP C. CORBIT et al., Respondents, v. J. I. CASE COMPANY et al., Appellants.*

*Reported in 424 P.2d 290.

*Hart Snyder,* for appellants J. I. Case Company and J. I. Case Credit Corporation.

*Brown & Thayer,* for appellant Whitworth College, Inc.

*McKevitt, Snyder & Thomas,* by *Francis J. McKevitt,* for appellant Northern Pacific Railway Company.

*Justin L. Quackenbush, R. Max Etter,* and *C. C. Rowan,* for respondents.

ROSELLINI, J.—This factually and legally complex controversy arose out of a prolonged effort by the plaintiffs, Philip C. Corbit and Shirley L. Corbit, husband and wife, and their wholly-owned corporation, Corbit Equipment Co., Inc., to establish both a retail dealership and a transfer dealership[1] based upon alleged contracts and protracted negotiations with the J. I. Case Company, a national manufacturer of farm and industrial implements and machinery.

---

[1] A "transfer dealership" is a term utilized by J. I. Case Company to describe an agent company which serves in a distributor-like capacity holding the company's merchandise in trust and shipping it out at the company's direction.

The plaintiffs brought this action against three distinct defendants: (1) J. I. Case Company and its subsidiary, J. I. Case Credit Corporation;[2] (2) Northern Pacific Railway Co.; and (3) Whitworth College, Inc. Although the complaint contained only two counts, it seems to us that the plaintiffs in effect are asserting five separate theories of recovery. Initially, there is a rather nebulous allegation and referral to an "overall agreement or contract" between the plaintiffs and all of the defendants.

Secondly, the plaintiffs sought to prove breach of a separate contractual duty by each of the defendants. With respect to J. I. Case Company, the plaintiffs claimed breach of a contract to grant a transfer dealership to Corbit Equipment Co., Inc., and breach of the retail dealership contract. With respect to Northern Pacific Railway Co., the plaintiffs claimed damages arising from a breach of the Northern Pacific's alleged contract to sell certain real estate to the plaintiffs. Finally, with respect to Whitworth College, the plaintiffs assert a claim for damages arising out of Whitworth's failure to carry out its alleged obligation to purchase the aforementioned Northern Pacific right-of-way land from the plaintiffs, erect a warehouse thereon, and lease back the premises to the plaintiffs.

The plaintiffs additionally attempted to prove grounds for recovery in promissory estoppel, collectively and individually, against all of the defendants. In effect, the plaintiffs sought to prove that all of the defendants had expressly or inferentially extended joint promises to carry out their respective parts of an over-all arrangement; that the defendants could reasonably have expected that this "collective" promise would induce the plaintiffs to undertake specific action of a definite and substantial character; and that injustice would thereby result if plaintiffs were not given a remedy. In the same vein, the plaintiffs made an effort to show grounds for recovery under a theory of

---

[2]Most of the references herein are made to J. I. Case Company only inasmuch as J. I. Case Credit Corporation is a wholly-controlled subsidiary of J. I. Case Company.

promissory estoppel against each of the defendants individually.

Finally, the plaintiffs attempted to prove a conspiracy on the part of all of the defendants to defeat the alleged contractual interrelationships between the parties and to deprive plaintiffs of a "transfer dealership" in products of the J. I. Case Company.

Thus, the five distinct theories of recovery were: (1) breach of an over-all contract; (2) breach of individual contractual obligations; (3) promissory estoppel against all of the defendants collectively; (4) promissory estoppel against each of the defendants individually; and (5) conspiracy on the part of all of the defendants to defeat the various legal relationships between the parties and to deprive the plaintiffs of the J. I. Case Company transfer dealership. Unfortunately, the first four theories mentioned above were lumped together in the plaintiffs' complaint during trial, and in the instructions to the jury in a single claim. In the words of the plaintiffs-respondents' brief:

> The First Count is an action for damages for breach of duty, or violation of obligation with a consequent interference with the rights of Respondents, which resulted in substantial damages and prevented them from earning commissions and profits. It arises out of agreements to establish Respondents as the retail dealer and distributor (Transfer dealer) for Case products at Spokane, Washington, by November 1, 1959.

On this first count, the jury returned a verdict for plaintiffs of $220,128.81 against all defendants. On the conspiracy count, the jury exonerated Whitworth College, rendered a verdict only against Northern Pacific Railway Co., J. I. Case Company, and J. I. Case Credit Corporation, in the amount of $171,688.56.

The three defendants have appealed separately from the trial court's judgment entered on the verdict and from its denial of motions by each of the defendants for judgment notwithstanding the verdict or for a new trial. In the interests of brevity and clarity, we shall not make an attempt to set out in any detail the voluminous facts involved in this

litigation. The following condensed factual narration contains only the pertinent evidence, viewed in the light most favorable to the plaintiffs' case.

In 1957, appellant J. I. Case Company began inquiring of the respondent Philip Corbit (formerly a J. I. Case Company trainee in the machinery and equipment business) as to whether he would be interested in becoming Case's retail dealer in Spokane, Washington. At that time, Corbit and his wife owned and operated a small farm machinery dealership at Davenport, Washington. After protracted negotiations between the parties, Corbit agreed to accept the retail dealership. At this time, the parties discussed and apparently contemplated that Corbit would also function as the distributor of Case machinery for eastern Washington and northern Idaho. Since the existing Case facilities in Spokane were inadequate for such an operation, it was initially contemplated that J. I. Case Company would construct and lease to plaintiffs a warehouse sufficient for both a retail and a transfer dealership.

After Corbit and his wife liquidated and closed up their financially shaky Davenport business and commenced to operate as a retail dealer in Spokane, the J. I. Case Company changed its plans about constructing and operating a warehouse under a lease arrangement with the Corbits. Thereupon, Corbit apparently accepted this change in plans and began to look for prospective local financing to undertake the construction and leasing of a warehouse facility which would be adequate to house a transfer dealership. Months later, the search for capital led Corbit to several individual trustees of the defendant Whitworth College, Inc., who expressed an interest on behalf of the college in the venture. The secretary of the board of trustees of that institution signed a so-called "commitment letter" on June 24, 1959, whereby Whitworth College, Inc., apparently indicated its willingness to buy land from Corbit which Corbit would purchase from Northern Pacific Railway. In other words, Whitworth was to build the required warehousing facility and then lease the premises back to Corbit. How-

ever, Rosenquist, the secretary of the board of trustees, and/or the several trustees of the board involved in the negotiations, such as they were, wanted some assurance from J. I. Case Company that it would stand behind the lease in the event that Corbit was unable to meet his obligations in that respect.

Meanwhile, Corbit and representatives of J. I. Case Company had been in touch with and/or negotiating with Northern Pacific Railway for the sale of approximately 7½ acres of railroad right-of-way land in Spokane which was suitable for the contemplated transfer dealership. On July 13, 1959, Northern Pacific made an express offer to sell the land to Corbit, conditioned upon receipt of a check for $80,733.75, the agreed-upon consideration. Although plaintiffs allege that they accepted this offer, the check as specified in the Northern Pacific offer was never tendered, and thus the consideration was never paid.

All of the defendants or their representatives, or purported representatives, began to have qualms apparently about their proposed roles in relation to the transfer dealership venture during the latter part of September 1959. Whitworth's actual or alleged representatives were unable to make certain as to the availability of the needed finances, apparently due to an increase in the interest rate, and perhaps for other reasons. On September 28 and 29, 1959, Case informed Northern Pacific that the J. I. Case Company did not intend to give Corbit Equipment Co., Inc., the transfer dealership for Case products; and further, that it intended to terminate its retail dealership with that company. On that basis, Northern Pacific wrote to Corbit on October 5, 1959, withdrawing its offer to sell the railway right-of-way property. There is evidence that J. I. Case Credit Corporation people began to interfere with the conduct of Corbit's retail business during this period by talking to prospective Corbit customers. On October 7, 1959, J. I. Case Company changed the locks on the building it shared with Corbit, and on October 12, 1965, Case representatives gave Corbit two letters which purported to cancel any and all contracts between J. I. Case Company and Corbit.

Corbit subsequently made demands upon each of the three defendants to follow through on their respective alleged promises and offered to complete his obligations. Having been refused by each and all of the defendants, he commenced this lawsuit.

The defendants, appealing separately, have submitted a total of 75 assignments of error. We will not deal with each individual assignment of error, but will discuss only the determinative issues thereby raised.

### CONSPIRACY

The plaintiffs-respondents have not cross-appealed from the jury verdict on the conspiracy count which, in effect, exonerated Whitworth College, Inc., from any liability as a coconspirator with any other defendants, *i.e.*, J. I. Case Company, J. I. Case Credit Corporation, and/or Northern Pacific Railway Co. Thus, as to the conspiracy count we are concerned here on appeal only with those aspects of the trial relating to the alleged conspiracy between J. I. Case Company, J. I. Case Credit Corporation and Northern Pacific Railway Co.[3]

█ In several decisions this court has held that an actionable civil conspiracy exists if two or more persons combine to accomplish an unlawful purpose or combine to accomplish some purpose not in itself unlawful by unlawful means. *Lewis Pac. Dairymen's Ass'n v. Turner*, 50 Wn.2d 762, 314 P.2d 625 (1957); *Harrington v. Richeson*, 40 Wn.2d 557, 245 P.2d 191 (1952); *Kietz v. Gold Point Mines, Inc.*, 5 Wn.2d 224, 105 P.2d 71 (1940). In order to establish a conspiracy the plaintiff must show that the alleged cocon-

---

[3]We preclude the possibility of establishing a conspiracy between a parent corporation (J. I. Case Company) and its wholly-controlled subsidiary (J. I. Case Credit Corporation). It is difficult, or impossible, to conceive of a parent corporation and its subsidiary entering into an *agreement* to accomplish any purpose—let alone an unlawful one. In this respect, the principles expressed in *Bereswill v. Yablon*, 6 N.Y.2d 301, 160 N.E.2d 531 (1959), are closely analogous wherein it was held that a conspiracy could not exist between an individual and his wholly-owned corporation. Thus, if Northern Pacific Railway Co. is not a coconspirator, there can be no conspiracy.

spirators entered into an *agreement* to accomplish the object of the conspiracy. *Lewis Pac. Dairymen's Ass'n v. Turner, supra.* Even more important, the plaintiff has the burden of preponderating the evidence; and furthermore, the existence of an alleged civil conspiracy must be established by *clear, cogent,* and *convincing* evidence. *Harrington v. Richeson, supra.*

In our review of the record we have not found as much as the proverbial scintilla of evidence respecting civil conspiracy by any or all of the defendants. Consequently, we must conclude, as a matter of law, that defendant Northern Pacific's motion for a directed verdict as to the conspiracy count, made at the close of all the evidence, should have been granted on the ground that the evidence was insufficient as a matter of law to establish a conspiracy between any of the alleged coconspirators.

■ The plaintiffs as to the civil conspiracy count failed to meet their burden of proof in this lawsuit. Additionally, their evidence certainly failed to measure up to the clear, cogent, and convincing test. While a finding that a conspiracy existed may be based on circumstantial evidence, mere suspicion is not a sufficient ground upon which to base a finding of conspiracy. *Cheesman v. Sathre,* 45 Wn.2d 193, 273 P.2d 500 (1954); *Harrington v. Richeson, supra.* The test of the sufficiency of the evidence to prove a conspiracy is that the circumstances must be inconsistent with a lawful or honest purpose and reasonably consistent *only* with existence of the conspiracy. *Couie v. Local 1849 United Bhd. of Carpenters & Joiners of America,* 51 Wn.2d 108, 316 P.2d 473 (1957). The legal concept of civil conspiracy does not necessarily encompass or apply as to all of the verbal or physical actions of parties who, by happenstance, are interested in the same general subject matter. Again, assuming arguendo the existence of a valid over-all contract or individual contracts between the defendants and the plaintiffs, the defendants are not thereby precluded from communicating to each other their intention to repudiate or terminate their obligations thereunder. For ex-

ample, while referring only to suspicious circumstances, the trial court in ruling on the motions for judgment notwithstanding the verdict stated:

> In other words, word and information came to the Northern Pacific back there from the Case office in Racine—when it was is not clearly shown—there is a letter of October 2nd referred to when the information became a matter of record—when it actually was transferred, Case company to Northern Pacific, through their respective home offices or field men back there, we don't know, but the inference *could be* that it was back there that the whole thing was set in motion, *that the head offices of these corporations were calling the plays,* and eventually what those plays were came—was transmitted to the west coast here, to the Portland office of Case and Mr. Wickwire, and to the Seattle office of the Northern Pacific and Mr. Moore. (Italics ours.)

The letter referred to (that of October 2) was plaintiffs' exhibit No. 180. It reads:

G. E. THORNE
General Agent
NORTHERN PACIFIC RAILWAY
913 Majestic Bldg.
Milwaukee (3), Wis.

October 2, 1959

Air Mail to West Coast

Subject:   Corbit Equipment Co.
Spokane, Washington

Mr. H. A. Peterson
Freight Traffic Manager
St. Paul 1 Minnesota

Please refer to exchanged correspondence on the above subject matter concerning negotiations with our Company for an industrial tract.

For the information of all concerned, Mr. E. P. Lui, Traffic Manager, J. I. Case Company, Racine, Wisconsin, called our office this morning stating that it is the desire of his Company to withdraw from any interest in this transaction.

Apparently there is something behind his request with which we are unfamiliar and which he could not divulge,

but Mr. Lui desires it to be definitely understood that all future negotiations should be made direct with the Corbit Equipment Company.

Please be governed accordingly.

G. E. Thorne<br>General Agent

GET-T

cc Mr. O A Kobs
   Mr. W. D. Miller
   Mr. C. J. Ryan-File A

This letter is typical of the evidence introduced in support of a conspiracy. While admittedly there is a *possibly* remote inference of concerted action between J. I. Case Company and Northern Pacific executives, that is not the only plausible explanation. J. I. Case Company was lawfully entitled to indicate its lack of interest in the allegedly consummated (or proposed) over-all transaction respecting a transfer dealership for plaintiffs without being liable as a conspirator. The inferences urged by the plaintiffs certainly are not the *only* possible ones. It is equally possible to attribute a lawful motive to each of the communications. It is most doubtful that the sum of all of the inferences most favorable to the plaintiff tend in any degree to show a conspiracy. It is certain that it fails to meet the test of *clear, cogent,* and *convincing* evidence. Thus, we conclude that Northern Pacific's motion for a directed verdict on the conspiracy count should have been granted.

## OVER-ALL CONTRACT

■  There seems to have been a tendency on the parts of all parties involved herein to be less than precise in the use of the terms "contract" and "agreement." But the two terms are not used interchangeably. Restatement, Contracts §§ 1 and 3 (1932), are helpful in this respect:

§ 1. A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.
§ 3. An agreement is a manifestation of mutual assent by two or more persons to one another.
*Comment:*

a. Agreement has a wider meaning than contract, bargain or promise. *The word contains no implication that legal consequences are or are not produced.* (Italics ours.)

By virtue of the contentions of the plaintiffs in the pretrial order and otherwise, where they refer to a "tri-party agreement," it seems to us that they are asserting the existence of some kind of an over-all legal relationship. But, technically speaking, legal consequences would arise or result only from an over-all *contract.*

Unfortunately, the court's instructions to the jury do not clearly segregate and emphasize an over-all contract as one possible theory of recovery. In fact, there is an overlapping or generality in the instructions, without clarifying direction from the court, as to the plaintiffs' theory of an over-all contract and his allegations of conspiracy. See, *e.g.,* the last paragraph of instruction No. 8:

If you find an overall or a primary contract in which each of the defendants took a part, and if you find that two or more defendants conspired to defeat the overall contract or any part in which a defendant was obligated, then you may find a conspiracy by such defendants regardless of which portion of the contract was planned to be defeated.

It is our conclusion that it was clearly error to allow the jury to consider the possible existence of an over-all contract. There was certainly no written document which purported to effectuate such a contractual relationship by setting out the bargained-for exchange of promises between all the parties. Furthermore, any oral contract purporting to cover every aspect of this proposed transaction would have encountered insurmountable statute-of-fraud problems.

The alleged existence and possibility of the jury finding a valid over-all contract permeates this entire controversy. We have reviewed the entire record and find no evidence that would justify a conclusion that any or all of the parties manifested an intention to enter into an over-all legal relationship. While it is true that getting a transfer dealership

for Corbit from Case depended upon the availability of an adequate warehousing facility, and in turn, the only desirable real estate Corbit had been able to locate was that of Northern Pacific Railway, and in turn, the search for capital to construct the warehouse had led him to Whitworth College, the tumbling domino sequence which resulted from Corbit's inability to put the transactions together does not indicate that the events or proposed legal obligations were *contractually* interrelated. Doubtless, Corbit would have welcomed securing an over-all contract which legally would have bound or obligated all of the parties necessary to consummate the entire transaction. But several matters remained in the negotiation stage, and there simply is no evidence indicating and supporting the existence of an over-all contract with clearly enforceable obligations between all of the parties, plaintiff and defendant.

In view of our determination hereinafter that the plaintiffs have no possible theory of recovery against either Northern Pacific Railway Co. or Whitworth College, Inc., the trial court's error in instructing the jury as to the possibility of finding an over-all contract will not necessitate a new trial as to those two parties. However, the overlapping or lack of clarity in the instructions is error which is persuasive for a new trial as to J. I. Case Company.

### INDIVIDUAL CONTRACTS

We now turn to the question of whether the plaintiffs achieved contractual relations with any of the defending parties on an individual basis.

If a contract existed between the plaintiffs and Whitworth College, Inc., its embodiment was plaintiffs' exhibit No. 23:

WHITWORTH COLLEGE
Spokane, Washington
June 24, 1959

Mr. Philip C. Corbit, President
Corbit Equipment Co., Inc.
North 1125 Monroe Street
Spokane, Washington

Re: Corbit Equipment and J. I. Case Warehouse
(N.P. Industrial Park)

Dear Mr. Corbit:

In accordance with discussions which you have had with Mr. S. A. Postell and Mr. J. R. Rosamond, we hereby wish to advise you that Whitworth College is willing to accept your proposal for the construction of a warehouse building according to the following terms:

1. The total cost of land and buildings on this proposal will approximate $300,000 to $315,000. Proposed improvements are to be built on land comprising approximately 7.33 acres located at the southwest corner of the N.P. Industrial Park adjacent to the Broadway overpass of the valley freeway. Corbit Equipment Co., Inc. and Philip C. Corbit and wife are to execute a lease for 25 years agreeing to pay a net rental of $8\frac{1}{2}\%$ of the total cost of land, buildings and other improvements mentioned above. In addition to the net rental of $8\frac{1}{2}\%$, lessee is to pay for all taxes, assessments, hazard and liability insurance, maintenance of building, and any other expenses pertinent to the use of said building. (The lease which was prepared by Mr. Rosamond and your attorney, Mr. Brook, is acceptable to the College as to its terms.)

2. It is hereby understood that plans and specifications will need to be prepared on this proposal which will be acceptable to both parties, which plans will be submitted to at least two reputable and reliable Spokane contractors for bid.

3. The purchase price for the above described land shall be forty cents per square foot, which price is to be approved by the J. I. Case Co.

4. In the option to purchase clause of the aforesaid lease, there is to be inserted an additional clause as follows:

If lessee exercises his right of option to purchase, the purchase price shall not be less than the original investor's cost of land, buildings and other improvements plus 1% per year to the time of exercising the option to purchase, regardless of appraised value. This is to be a minimum price only and is not to be construed as a maximum, if appraised value is higher.

5. J. I. Case Co., Manufacturer, is to execute a memorandum agreement with the Corbit Equipment Co., Inc. as Dealer wherein they assume certain responsibilities

under the aforesaid lease. The last agreement submitted to Mr. Rosamond is acceptable as to terms of this agreement and said memorandum agreement is to become a part of the aforesaid lease.

6. This commitment letter shall be null and void if not accepted within 30 days from date hereof and acceptance of this commitment shall be construed to be execution of the aforesaid lease by the lessee.

If there are any further questions regarding this matter, please contact Mr. Rosamond.

Very truly yours,
WHITWORTH COLLEGE
Werner Rosenquist [signed]
Werner Rosenquist
Secretary

■ This document cannot operate as the written memorial of a bargained-for exchange of promises between the parties; nor can it be termed an offer by Whitworth College unless the person who executed it had express, implied, or apparent authority to so act on behalf of the college. Curiously enough, the instrument was not drafted by the purportedly authorized corporate secretary-signator, but it was drafted by one James Rosamond, a local real estate agent. There is uncontradicted testimony to the effect that Rosamond simply intended the letter to be a starting point or sample and that Rosenquist would redraft it upon college stationery and insert whatever additional conditions he felt necessary to limit Whitworth's undertaking. Instead, Rosenquist signed the letter as drafted by Rosamond, simply adding to it his dubious status or identity as secretary of the board of trustees of Whitworth College.

The record is devoid of any evidence showing *express* authorization to Rosenquist to bind Whitworth College in this particular transaction or in transactions of this general nature or scope. Furthermore, Rosenquist, as the uncompensated secretary of the 36-man board of trustees of a nonprofit, educational institution, would not, just by the nature of his office, possess either *implied* or *inferred* authority to bind the college to purchase real estate, to invest

a very considerable amount of funds therein, and to lease it back for a period of 25 years to the vendor of the land, *i.e.,* Corbit.

■ There can be no *apparent authority* to bind the college in this instance because apparent authority arises only out of manifestations by an alleged principal to the person asserting an agency, or to the community in general, that there is an agency relationship. Restatement (Second), Agency § 8 (1958). Insofar as indicated by the record herein, the college made no such manifestations to either the community in general or the plaintiffs; nor had Mr. Corbit had any prior dealings with Mr. Rosenquist which would have indicated that Mr. Rosenquist was so empowered.

Thus, Mr. Rosenquist's signature to plaintiffs' exhibit No. 23 was of no legal effect with respect to the college. The so-called "commitment letter" is neither a contract nor an offer to enter into one.

But, even if we disregard the above-discussed agency problem and assume, arguendo, the operative legal effect of Mr. Rosenquist's communication as an offer, that offer was never accepted. Paragraph No. 6 of the so-called "commitment letter" clearly specifies the time and manner in which acceptance by Corbit was to be consummated. The time specified was 30 days. The manner of acceptance precisely prescribed was by execution of a lease by Mr. and Mrs. Corbit and Corbit Equipment Co., Inc., in which the J. I. Case Company, also, was to "assume certain responsibilities under the aforesaid lease." Corbit certainly did not accept within the 30 days specified. Mr. and Mrs. Corbit never signed the lease in their personal and individual capacities. The J. I. Case Company definitely did not assume any responsibility and/or liability for any portion of the rent under the proposed 25-year lease in the event the Corbit Equipment Co., Inc. and the Corbits, personally, were financially unable to pay. These seem to be most critical and dubious factors as to any acceptance by the Corbits of Whitworth's alleged "offer" to construct and lease a warehouse for the amorphous Corbit-Case dealer-distributorship.

In determining the nature of the legal relationship, if any, between Northern Pacific Railway Co. and the plaintiffs, we are concerned with the problem of whether the plaintiffs ever accepted the railway company's offer. Northern Pacific frankly admits, as it must, that it extended a firm offer to the plaintiffs to sell the land in question, but it strongly emphasizes that it expressly conditioned its offer to execute a deed to the property upon tender and receipt of the plaintiffs' check for $80,733.75. The plaintiffs allege that they accepted the railroad's offer, yet nowhere in the evidence does it appear that a check was tendered. Instead, the plaintiffs requested an option of 6 months on September 2, 1959, some 50 days after the making of the original offer by Northern Pacific. There is a dispute as to whether the railway ever accepted this request for an option, which was unaccompanied by consideration. It would seem more likely that the situation described by Restatement, Contracts § 38 (1933) is apropos:

A *counter-offer* by the offeree, relating to the same matter as the original offer, is a *rejection of the original offer*, unless the offeror in his offer, or the offeree in his counter-offer states that in spite of the counter-offer the original offer shall not be terminated. (Italics ours.)

At any rate, assuming arguendo the acceptance of the Corbit's request for an option, the only legal concomitant as to such a manifestation would be a continuation of the power of acceptance in the plaintiffs. But again, the request for an option was unaccompanied by consideration, and, thus, defendant's offer was not irrevocable. Restatement, Contracts § 46 (1933).

The plaintiffs never accepted Northern Pacific's offer by complying with the conditions set out by the offeror. Inasmuch as the offer was not irrevocable, any' legal power of acceptance still existing in the plaintiffs after their counter-offer of September 2, 1959, was effectively revoked upon receipt by the plaintiffs of the railroad's letter of October 5, 1959. There should have been a directed verdict in Northern Pacific's favor as to plaintiffs' claim for dam-

ages arising out of an alleged existing contract between these two parties for a sale of real estate in question.

As to the liability of J. I. Case Company for breach of contractual duty, we are convinced that there must be a new trial. The aforementioned confusion of plaintiffs' theory as to an over-all contract with the other four theories of recovery so permeated the conduct of the trial and the court's instruction to the jury that it is most difficult to segregate with any clarity the basis upon which the jury may have found liability as to Case and what portion of the damages, if any, the jury awarded for breach of contractual duty by J. I. Case Company.

### "COLLECTIVE" PROMISSORY ESTOPPEL

■ For the reasons mentioned heretofore in the portion of this opinion which discusses the alleged existence of an over-all contract, there can be no basis of recovery in "collective" promissory estoppel. In other words, there is no evidence that the three defendants extended a mutual promise or set of mutual promises to the plaintiffs upon which a claim for damages under a promissory estoppel theory can be established.

### INDIVIDUAL PROMISSORY ESTOPPEL

■ Promissory estoppel has not yet been accorded clear-cut and precise analysis and definition by the courts. In fact, the analysis by the textbook writers and law review commentators is somewhat less than illuminating. Strangely enough, the statement of the theory in Restatement, Contracts § 90 (1932) is relatively simple:

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

We have previously cited the Restatement's formulation as being a useful guideline: *Spooner v. Reserve Life Ins. Co.,* 47 Wn.2d 454, 287 P.2d 735 (1955); *Hill v. Corbett,* 33 Wn.2d 219, 204 P.2d 845 (1949); *State v. Northwest Magne-*

*site Co.*, 28 Wn.2d 1, 182 P.2d 643 (1947); and cases cited therein. In effect, § 90, *supra*, sets out five prerequisites for a recovery in promissory estoppel: (1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.

In the light of our holding hereinbefore that Mr. Rosenquist was in no way authorized to bind Whitworth College in the manner asserted by the plaintiffs, the first element, *a promise*, is missing with respect to Whitworth College, Inc. While the Rosamond-Rosenquist "memorandum of agreement" contains promissory language, the promises, if any, are those of an unauthorized agent and not those of Whitworth College. There can be no recovery against Whitworth College on a theory of promissory estoppel.

With respect to Northern Pacific Railway Co., we fail to see any correlation between any "action or forbearance of a definite and substantial character" on the part of the plaintiffs and the railroad's promise to sell the land. The second and third elements of promissory estoppel recovery are missing. Even assuming full knowledge by Northern Pacific of every facet of the proposed dealer-distributor transaction, what change of position by the plaintiffs should the railroad have expected? Even more conclusively, what change of position did the promisee (the plaintiffs) undertake (or forbear to undertake) during the allegedly operative period of the offer, *e.g.*, from July 13, 1965 to October 2, 1965?

In addition, the provisions of Restatement, Contracts § 91 (1932) are directly in point:

> If a promise within the terms of §§ 86-90 is in terms conditional or performable at a future time the promisor is bound thereby, but performance becomes due only upon the happening of the condition or upon the arrival of the specified time.

Northern Pacific Railway's offer to execute a deed in favor of the plaintiffs was expressly conditioned upon receipt of a

check for the agreed upon consideration. Even if all of the elements of a theory of promissory estoppel were present, Northern Pacific's performance would not be due, since the check was never forwarded.

As to J. I. Case Company, there must be a new trial as to possible liability to the plaintiffs by virtue of the principles of promissory estoppel and/or express contract. Again, it is impossible to ascertain what portion, if any, of the damages awarded under the amalgamated count one were awarded by the jury solely as to J. I. Case Company promises which allegedly induced definite and substantial action by the plaintiffs.

The parties stipulated that the sum claimed by J. I. Case Company in its counterclaim should be $15,000. Error is assigned to the failure of the trial court to instruct the jury to render a verdict for $15,000 in favor of J. I. Case Company. There were no special interrogatories or verdicts concerning this counterclaim; therefore, it is not possible to determine whether or not the jury considered the claim by way of setoff to its award of general damages to the plaintiffs. J. I. Case Company properly preserved its rights in this respect on appeal, and we will assume that the trial court will give the counterclaim appropriate attention upon new trial.

In conclusion, our decision herein is to reverse the judgment against the defendants, Northern Pacific Railway Co., J. I. Case Company, and J. I. Case Credit Corporation on the conspiracy count. In addition, we reverse the trial court on its denial of motions by defendants Northern Pacific Railway Co. and Whitworth College, Inc., challenging the sufficiency of the evidence on the all-inclusive "breach of contract" count. There should be a new trial as to the contractual or promissory estoppel liability of J. I. Case Company to the plaintiffs.

It is so ordered.

ALL CONCUR.