**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientsoftwareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| DAN YOUNG, an individual,<br><br>            Appellant,<br><br>      v.<br><br>TODD S. RAYAN and JANE DOE RAYAN, husband and wife; SAMUEL WILKENS and JANE DOE WILKENS, husband and wife; PENNY ROHR and JOHN DOE ROHR, wife and husband; and ALTHAUSER RAYAN ABBARNO, a Washington Limited Liability Partnership,<br><br>            Respondents. | No. 84426-1-I<br><br>ORDER GRANTING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

Respondents Todd Rayan, Samuel Wilkens, Penny Rohr, and the law firm Althauser Rayan Abbarno, LLP, moved for reconsideration of the published opinion filed on June 26, 2023. The court has determined that respondents' motion for reconsideration should be granted, the opinion should be withdrawn, and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the Respondents' motion for reconsideration is granted; and it is further

ORDERED that the published opinion filed on June 26, 2023, is withdrawn; and it is further

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 84426-1-I/2

ORDERED that a substitute published opinion be filed.

Smith, C.J.

Hazelrigg, A.C.J.

Dwyer, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DAN YOUNG, an individual,<br><br>                Appellant,<br><br>      v.<br><br>TODD S. RAYAN and JANE DOE RAYAN, husband and wife; SAMUEL WILKENS and JANE DOE WILKENS, husband and wife; PENNY ROHR and JOHN DOE ROHR, wife and husband; and ALTHAUSER RAYAN ABBARNO, a Washington Limited Liability Partnership,<br><br>                Respondents. | No. 84426-1-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

SMITH, C.J. — The litigation privilege immunizes participants in legal proceedings from civil liability based on statements they make during litigation. Litigants often strongly and passionately express their position over the course of a case. The privilege exists to encourage frank and open testimony and argument despite this turbulent emotional atmosphere. It protects participants from retaliatory, derivative lawsuits—regardless of the merit of those suits— instead relying on checks by the trial court such as sanctions to address false testimony. The privilege embodies a compromise. It acknowledges that litigants may at times abuse its protection, while recognizing that our legal system depends on reducing the threat that every statement or argument may lead to further litigation.

No. 84426-1-I/2

Dan Young, an attorney, sued Todd Rayan, Samuel Wilkens, Penny Rohr, and the law firm that employs them based on statements they made during court proceedings. Their statements accused Young of acquiring documents from them through misrepresentation. Young insists that the statements were perjured. He asks us to identify an exception to the litigation privilege for statements made in an attempt to abuse and weaponize the legal process. We decline to do so and affirm, concluding that the trial court properly dismissed Young's claims at summary judgment.

FACTS

In 2018, Elizabeth Bartlett, formerly Elizabeth Parman, sued her ex-husband Shawn Parman and his mother Ruth Parman in Thurston County Superior Court over the ownership of a property in Olympia, Washington. She alleged that she had purchased the property in 1997 using a "gift of early inheritance" from her parents and, through the application of much of her own money, time, and effort, transformed it into both a home and a working horse farm. In 2000, she transferred the property to Ruth[1] and her husband Robert via quitclaim deed, trusting that with their names on the title it would be easier to take out a loan to build a house. The transfer, she claimed, was based on the understanding that she and Shawn were entering into a partnership with Ruth and Robert, a condition of which was that Ruth and Robert would convey half of

---

[1] For the sake of clarity and consistency, we refer to Shawn Parman, Ruth Parman, Robert Parman, and Elizabeth Bartlett (f/k/a Parman) by their first names.

No. 84426-1-I/3

the property to Shawn and the other half to Elizabeth on their deaths. According to Elizabeth, Robert and Ruth included parallel provisions in their wills to effect this testamentary transfer.

The inheritance did not come to pass. Robert died in 2005. In 2015, Shawn and Elizabeth divorced. Concerned about her eventual ownership of the property, Elizabeth sought and apparently received assurances from Ruth about the contents of her will. But in 2017, allegedly at Shawn's urging, Ruth altered her will to exclude transfer of the property to Elizabeth.

Litigation ensued. Ruth's estate, represented by Shawn, was substituted for Ruth after her death in 2019. In 2020, Shawn petitioned for his father's intestate probate, claiming that Robert had not left a will. Initially filed in King County and then challenged by Elizabeth, the probate matter was transferred to Thurston County to be consolidated with Elizabeth's first lawsuit. Elizabeth's challenge to the probate matter was dismissed as untimely.[2]

Litigation continued undeterred and with increasing intensity. Seeking to introduce Robert's will into the record to persuade the court to reconsider its dismissal, Dan Young, Elizabeth's attorney, phoned the offices of the law firm Althauser Rayan Abbarno, which, along with several of its employees, is the respondent in this case. Young had learned that an attorney, John Turner, had

---

[2] That dismissal was recently affirmed on appeal. <u>Bartlett v. Estate of Parman</u>, No. 56536-6-II, slip op. at 1 (unpublished) (Wash. Ct. App. Nov. 15, 2022), https://www.courts.wa.gov/opinions/pdf/D2%2056536-6-II%20Unpublished%20Opinion.pdf.

3

No. 84426-1-I/4

drafted Ruth and Robert's wills, and that Turner's papers had been held by Althauser Rayan Abbarno since his retirement.

The details of Young's contact with individuals at Althauser Rayan Abbarno are disputed. Young admits that he mentioned he was an attorney but denies ever saying that he represented Robert Parman's estate. Young claims that he spoke with Penny Rohr, the firm's receptionist, who indicated that attorney Samuel Wilkens had inherited Turner's matters. He reports that Rohr said Wilkens would return his call, that Wilkens did not, and that Young followed up several weeks later. During that call, Rohr apparently spoke with Wilkens while Young was on hold and, when she returned to the phone, indicated that she would send him a copy of the will[3] by e-mail, which she did.

Rohr describes matters similarly in most respects. She acknowledges receiving a call from Young. She says that she inquired with Wilkens about whether she should send Young a copy of the will, and that Wilkens approved. But contrary to Young's narrative, she asserts that Young "indicated" that he represented Robert Parman's estate and it was based on this understanding, which she had shared with Wilkens, that Wilkens authorized the release of Robert's will.

Wilkens, on the other hand, reports that "[t]o the best of my recollection," he spoke directly with Young. He says that during that conversation, Young

---

[3] What Young received is just that—a copy. The original will was not retained in Turner's files, only an executed copy of it. When this opinion says "the will," it is referring to this copy, not to the original document.

4

stated that he represented Robert Parman's estate. On that basis, Wilkens reports authorizing Rohr to send Young a copy of the will.

Regardless of precisely what words were exchanged, Young obtained the will. He introduced it into the underlying litigation via a motion to reconsider the dismissal of the probate matter and opposing a motion from Shawn for attorney fees. Young also issued a subpoena directing Althauser Rayan Abbarno to turn over the same materials he had just received. Shawn's attorney, Mark Owen Gabrielson, responded by issuing his own subpoena to Althauser Rayan Abbarno, seeking Ruth and Robert's estate planning records. Todd Rayan, the firm's managing partner, reached out to Gabrielson and, following a discussion, directed Wilkens and Rohr to write down their recollections of the events leading to Rohr sending Young the will. He then supplied their recollections to Gabrielson as sworn declarations. And he objected to Young's subpoena in a letter because "[t]he prior disclosure and emailing of one document was based on a misrepresentation to my staff . . . [which means that the will was] obtained through fraudulent means."[4]

Two motions, a police investigation, a bar grievance, and the initiation of the present lawsuit followed. First, Gabrielson moved to strike the will from the record in the underlying actions and seal it. Young then moved to compel

---

[4] Though designated to be part of the record on appeal, the portions of the Clerk's Papers at which this letter should appear are either corrupted or missing. The letter is attached as an appendix to the Appellant's Opening Brief, however. The parties agree that the appendix is an accurate copy of the letter and we may look to it for our review.

production of the will from Althauser Rayan Abbarno.  Escalating the dispute beyond the courtroom, Gabrielson called the Centralia Police Department about Young, complaining about the manner in which he acquired the will.  Detective Timothy O'Dell investigated and referred the case to the Lewis County Prosecuting Attorney's Office, having concluded that probable cause existed to arrest Young for criminal impersonation in the first degree.  Young submitted a bar grievance against Wilkens accusing him of perjuring himself in his declaration.  Finally, on January 18, 2022, Young filed the complaint in this lawsuit in King County Superior Court.

Ten days later, the trial court heard the motions to strike, seal, and compel.  It struck and sealed the will in the probate proceeding.  It sealed but did not strike the will in Elizabeth's first lawsuit, preserving for another day questions about its admissibility.  It denied Young's motion to compel.  Throughout its oral ruling, the court expressed concern that RPC 1.6—which governs confidentiality of client files but is not an evidentiary rule and does not create a privilege—was implicated.

Meanwhile, the present lawsuit moved rapidly from its initiation to its dismissal.  Young sued Rohr, Wilkens, Rayan, and Althauser Rayan Abbarno, bringing claims of defamation, false light, and civil conspiracy.  The defendants moved for summary judgment, arguing that Young's claims were based on statements made during the course of litigation, were protected by the litigation

6

privilege doctrine, and therefore could not stand. The trial court agreed and dismissed the case in August 2022.

Young appeals.

ANALYSIS

This appeal asks whether three causes of action—defamation, false light, and civil conspiracy—may be sustained when they are based on statements made during court proceedings. Young contends that they can be. He attempts to identify a number of exceptions to the application of litigation privilege, which normally prohibits liability for statements made in court. As a general matter, he professes that his claims may be sustained because the statements on which they are based abused the court process itself to do further harm. But his arguments are not grounded in Washington case law, which applies the litigation privilege broadly. We affirm the trial court's dismissal of his claims as a result.

Standard of Review

We review summary judgment de novo, considering the evidence and reasonable inferences drawn from it in the light most favorable to the nonmoving party. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is appropriate only when no genuine issue exists as to a material fact and the moving party is entitled to judgment as a matter of law. Keck, 184 Wn.2d at 370. "A material fact is one that affects the outcome of the litigation." Owen v. Burlington N. and Santa Fe R.R. Co., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005).

<u>Litigation Privilege Generally</u>

The "litigation privilege"[5] is a judicially created privilege that protects

participants—including attorneys, parties, and witnesses—in a judicial

proceeding against civil liability for statements they make in the course of that

proceeding. <u>See, e.g.</u>, <u>Mason v. Mason</u>, 19 Wn. App. 2d 803, 830-31, 497 P.3d

431 (2021) <u>review denied</u>, 199 Wn.2d 1005 (2022); <u>Deatherage v. Examining Bd.</u>

<u>of Psychology</u>, 134 Wn.2d 131, 135-36, 948 P.2d 828 (1997).  As applied to

witnesses, the privilege is sometimes referred to as witness immunity, and under

it, "[a]s a general rule, witnesses in judicial proceedings are absolutely immune

from suit based on their testimony."  <u>Bruce v. Byrne-Stevens & Assocs. Eng'rs,</u>

<u>Inc.</u>, 113 Wn.2d 123, 125, 776 P.2d 666 (1989).

Statements "are absolutely privileged if they are pertinent or material to

the redress or relief sought, whether or not the statements are legally sufficient to

obtain that relief."  <u>McNeal v. Allen</u>, 95 Wn.2d 265, 267, 621 P.2d 1285 (1980).

But statements having " 'no connection whatever' " with the litigation are not

privileged.  <u>Demopolis v. Peoples Nat. Bank of Wash.</u>, 59 Wn. App. 105, 110,

796 P.2d 426 (1990) (quoting RESTATEMENT (SECOND) OF TORTS, § 586,

comment c (AM. LAW INST. (1977))).  Thus, not every passing statement made in

court avoids liability.  But the determination of pertinency is not a high bar.  As

---

[5] Also historically referred to in Washington as "absolute privilege," <u>Deatherage v. Examining Board of Psychology</u>, 134 Wn.2d 131, 135, 948 P.2d 828 (1997), and in other jurisdictions variously as "judicial statements privilege," <u>Maggard v. Kinney</u>, 576 S.W.3d 559, 567 (Ky. 2019), or "official proceedings privilege," <u>Klem v. Access Insurance Company</u>, 17 Cal. App. 5th 595, 613, 225 Cal. Rptr. 3d 711 (2017).

the Restatement (Second) of Torts indicates, a statement "need not be strictly relevant to any issue" so long as it bears "some reference to the subject matter of the . . . litigation." RESTATEMENT § 586, comment c.

Litigation privilege therefore prohibits liability stemming from statements (1) made in the course of a judicial proceeding (2) that are pertinent to the litigation. Pertinency is a question of law reviewed de novo. <u>Demopolis</u>, 59 Wn. App. at 110.

The purpose of the litigation privilege doctrine is to encourage frank, open, untimorous argument and testimony and to discourage retaliatory, derivative lawsuits. As applied to attorneys, it furthers " 'a public policy of securing to [counsel] as officers of the court the utmost freedom in their efforts to secure justice for their clients.' " <u>Mason</u>, 19 Wn. App. 2d at 831 (quoting <u>McNeal,</u> 95 Wn.2d at 267). As applied to witness testimony, it preserves "the integrity of the judicial process by encouraging full and frank testimony." <u>Bruce</u>, 113 Wn.2d at 126. The rule addresses the concern that a witness may either be reluctant to come forward to testify in the first place or shade their testimony "to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence." <u>Briscoe v. LaHue</u>, 460 U.S. 325, 333, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983).

The potential harms of a broad application of litigation privilege—namely, preventing redress for a harm that would otherwise sustain a civil suit—are blunted by forms of accountability not available outside of judicial proceedings.

No. 84426-1-I/10

The rule assumes that false or harmful statements in a judicial proceeding may be addressed through the use of tools such as sanctions, contempt, "[a] witness' . . . oath, the hazard of cross-examination, and the threat of prosecution for perjury." Bruce, 113 Wn.2d at 126. Additionally, immunity does not typically extend to professional disciplinary proceedings, which may occur based on testimony or behavior during litigation and which are therefore an additional avenue to confront harm caused by privileged statements. Wynn v. Earin, 163 Wn.2d 361, 378, 181 P.3d 806 (2008). In part because the privilege assumes that improper conduct should not be entirely impossible to address, immunity is not usually extended to settings where judicial authority lacks "the power to discipline as well as strike from the record statements which exceed the bounds of permissible conduct." Twelker v. Shannon & Wilson, Inc., 88 Wn.2d 473, 476, 564 P.2d 1131 (1977).

Though it often arises in the context of defamation suits, the courts have rejected the notion that litigation privilege applies only to that claim. Our supreme court, in the context of witness immunity, has said that the chilling effect of subsequent litigation "is the same regardless of the theory on which that subsequent litigation is based." Bruce, 113 Wn.2d at 131-32. More generally, the supreme court has used broad language to describe the litigation privilege's scope, saying that it "applies to statements made in the course of judicial proceedings and acts as a bar to *any* civil liability." Deatherage, 134 Wn.2d at 135 (emphasis added). Litigation privilege has been applied to bar liability

10

under a range of causes of action, including civil conspiracy.  Jeckle v. Crotty, 120 Wn. App. 374, 386, 85 P.3d 931 (2004).

Mason's Public Policy Exception

Litigation privilege therefore has the potential to bar any of the three causes of action Young pleaded in this case: defamation, false light, and civil conspiracy.  Young, however, attempts to identify an exception to the litigation privilege doctrine that that would preclude its application when it would not further any compelling public policy.  Division II of this court has recently taken this approach in Mason, on which Young heavily relies.  19 Wn. App. 2d at 834.  We decline to follow Mason's recognition of a public policy exception to the litigation doctrine.

Mason concerned, among other issues, claims made against an attorney based on his statements in an underlying lawsuit.  19 Wn. App. 2d at 830.  It reversed the trial court's application of the litigation privilege to dismiss a claim of abuse of process, a tort involving misuse of a judicial proceeding "to accomplish an end for which the process was not designed."  Mason, 19 Wn. App. 2d at 834.  It likewise refused to apply the privilege to a related claim of intentional infliction of emotional distress by way of abusive litigation tactics.  19 Wn. App. 2d at 843.

Mason reasoned as follows.  To begin, it pointed to the nature of the abuse of process tort, which "must be used 'to accomplish some end which is without the regular purview of the process.' "  Mason, 19 Wn. App. 2d at 834-35.  It then identified what it characterized as a mismatch between the goals of the

11

judicial system, the intent of an abuse of process tortfeasor, and the litigation privilege's requirement that protected statements pertain to the legal proceeding. It asserted that "[i]ntegral to an abuse of process claim [is that] the complained of conduct, by its nature, must not be related to the legitimate purposes of a judicial proceeding." Mason, 19 Wn. App. 2d at 834. It concluded "[c]onsequently, litigation privilege does not apply, and an attorney can be liable for abuse of process where the attorney was alleged to have intentionally employed legal process for an inappropriate and extrinsic end." Mason, 19 Wn. App. 2d at 835. A more recent Division II case has articulated Mason's rule this way: "we apply litigation privilege where the conduct bears some relation to a judicial proceeding and where compelling public policy justifications support its application." Scott v. Am. Express Nat'l Bank, 22 Wn. App. 2d 258, 265-66, 514 P.3d 695 (2022).[6]

These cases appear to have added a third element to the litigation privilege analysis. It is no longer enough, under Mason and Scott, to ask whether a statement was (1) pertinent (2) to a judicial proceeding. We must now also ask (3) whether immunity furthers public policy under the particular facts of the case, in part by looking to an alleged tortfeasor's intent.

---

[6] Scott, which Young relies on in his briefing, declined to apply litigation privilege to bar a consumer protection act claim against a law firm because immunity would " 'neither preserve[] 'integrity of the judicial process,' nor 'further[] the administration of justice.' " 22 Wn. App. 2d at 270 (quoting Mason, 19 Wn. App. 2d at 838). In Scott, unlike in Mason, the court denied immunity because the firm was acting in its capacity as a collection agency when conducting the acts upon which its liability was allegedly based; the court did not consider the defendants' intent. 22 Wn. App. 2d at 270.

No. 84426-1-I/13

We are unconvinced for several reasons. First, it does not follow that a tortfeasor's intent in making a statement informs whether that statement was pertinent to the proceeding in which it was made. A statement made with malice and intent to abuse the process and causing actual harm may be pertinent to a proceeding, even if it would also normally give rise to civil liability.

Second, the litigation privilege's broad purpose is to prevent even the *threat* of litigation and so avoid potentially chilling testimony. A standard that creates exceptions where intent to employ the litigation process for an inappropriate end is simply "alleged" fatally undermines that purpose. Such intent is easy to allege, allowing for artful pleading. It is also likely to actually exist in most tort cases based on perjured testimony—the purpose of the judicial system is never, after all, to educe false testimony, so any false statement arguably pursues an inappropriate end under this analysis. Mason's exception consequently risks swallowing the broader rule. And, perhaps most troublingly, the inherently case-by-case application of Mason's standard, which looks to a particular defendant's actual intent, will most often force prolonged and expensive discovery and litigation. This would hobble the litigation privilege's main goal: to deter even the initiation of lawsuits, and in so doing avoid chilling the speech of those who might otherwise feel threatened by such litigation.[7]

---

[7] The principle is well expressed by the Connecticut Supreme Court in Rioux v. Barry:

> The purpose of affording absolute immunity to those who provide information in connection with judicial and quasi-judicial proceedings is "that in certain situations the public interest in having people speak freely outweighs the risk that individuals will

Third, <u>Mason</u> does not root its analysis in relevant case law. For its discussion of public policy it relies on language from <u>Bender v. Seattle</u>, 99 Wn.2d 582, 600, 664 P.2d 492 (1983), that "[g]enerally, some compelling public policy justification must be demonstrated to justify the extraordinary breadth of an absolute privilege." <u>Mason</u>, 19 Wn. App. 2d at 843. It reads <u>Bender</u> as supporting a search for a compelling public policy justification for applying litigation privilege in each individual case, and finds no such justification where statements abused the purposes of the court system. <u>Mason</u>, 19 Wn. App. 2d at 843. <u>Bender</u>, however, discussed the difference between doctrines of absolute and qualified (and discretionary) immunity in the abstract, not as applied to any particular set of facts. 99 Wn.2d at 600. Its discussion focused on whether to extend a privilege in certain procedural context, or to certain sorts of actor. <u>Bender</u>, 99 Wn.2d at 600-01. Indeed, one of the examples <u>Bender</u> gives of an absolute privilege, contrasted with the qualified privilege extending to statements made by law enforcement officers that was in dispute, is the litigation privilege. 99 Wn.2d at 600.[8]

---

occasionally abuse the privilege by making false and malicious statements." "[T]he possibility of incurring the costs and inconvenience associated with defending a [retaliatory] suit might well deter a citizen with a legitimate grievance from filing a complaint."

283 Conn. 338, 343 927 A.2d 304 (2007) (alterations in original) (citations omitted) (quoting <u>Chadha v. Hungerford Hosp.</u>, 272 Conn. 776, 786, 865 A.2d 1163 (2005); <u>Craig v. Stafford Constr., Inc.</u>, 271 Conn. 78, 95, 856 A.2d 372 (2004)).

[8] <u>Mason</u> also relied on <u>Fite v. Lee</u>, 11 Wn. App. 21, 521 P.2d 964 (1974), to support the idea that an abuse of process claim may lie against an attorney unhindered by the litigation privilege. 19 Wn. App. 2d at 835-40. At no point,

No. 84426-1-I/15

Mason's discussion of the extension of privilege appears to conflate

extension in the first instance to a type of proceeding or actor, a process

requiring recognition of a compelling public policy justification, and its application

in an individual case. But our supreme court has emphasized elsewhere that

while it is true that extending an absolute privilege in the first instance requires

"compelling public policy justifications," the privilege has *already* been extended

to cover most, if not all, participants in court proceedings. Deatherage, 134

Wn.2d at 136 (discussing extension of privilege to expert witnesses in Bruce).

Fundamentally, the privilege already serves a compelling public policy in any

given case as it is currently constituted: it ensures that witnesses, parties, and

their counsel may speak freely and openly in court proceedings without fear of

ensuing litigation. Deatherage, 134 Wn.2d at 137.

We therefore decline to follow Mason and do not recognize a case-by-

case "public policy exception" to the litigation privilege doctrine that looks to a

defendant's intent. We emphasize that the privilege, by design, applies where

bad behavior may be addressed through means not always available outside the

courtroom, such as sanctions, contempt, striking of testimony, cross-

examination, the threat of perjury, and professional discipline. And the effects of

improper statements on the progress of the lawsuit in which they are made may

---

however, does Fite discuss the litigation privilege or any other form of immunity.
And where a legal theory is not discussed in a case's opinion, that opinion does
not control future cases where the theory is properly raised. Berschauer/Phillips
Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wn.2d 816, 824, 881 P.2d 986
(1994).

be addressed through direct appeal if the trial court errs in its approach. Those harmed by privileged statements are correspondingly not without recourse, even if redress is imperfect. The litigation privilege accepts that imperfection in pursuit of freer speech and conduct in judicial proceedings.

We now proceed to determine whether Young's particular claims in this case—defamation, false light, and civil conspiracy—are based in language "pertinent" to a court proceeding and so are barred by the litigation privilege.

<u>Young's Defamation and False Light Claims</u>

Application of the litigation privilege doctrine to the first two causes of action—defamation and false light—is straightforward, and we conclude that the trial court correctly dismissed them at summary judgment.

Analysis of litigation privilege in the context of defamation and false light is made easy because both torts include an element requiring the plaintiff to ground their claim in specific statements. A defamation claim has four essential elements: (1) a false communication, (2) which was unprivileged, (3) and for which the defendant is at fault, (4) caused the plaintiff damages. <u>Mark v. Seattle Times</u>, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981). False light, meanwhile, creates liability when the defendant (1) publicizes a matter (2) that places another in a false light, (3) the false light would be highly offensive to a reasonable person, and (4) the defendant knew of or recklessly disregarded the falsity of the publication and the false light in which the plaintiff would be placed. <u>Eastwood v. Cascade Broad. Co.</u>, 106 Wn.2d 466, 470-71, 722 P.2d 1295

16

(1986). At their cores, both torts are concerned with the harm suffered by a plaintiff because of a defendant's statements.

Here, the defendants are immune from liability stemming from the statements that support both Young's claim of defamation and his claim of false light. Young's complaint makes the foundational nature of these statements clear. His defamation claim is premised on three statements: (1) Rohr in her declaration saying that Young had indicated to her that he represented the estate of Robert Parman; (2) Wilkens in his declaration saying that he had spoken with Young and Young had represented that he was the attorney for Parman's estate; and (3) Rayan incorporating Rohr and Wilkens' statements in his objection to Young's subpoena. Young's complaint does not explicitly state the publications on which it alleges liability under a false light theory, but it reincorporates the factual allegations made earlier in the complaint, which do not mention any other publication. It therefore rests on the same statements.

We conclude that the defendants are immune to any claim for liability based on these statements. We reach this conclusion regardless of the dispute over precisely what was said during Young's phone call to the law firm, because exactly what was said that day is not material to whether litigation privilege applies. The first two statements are sworn declarations providing testimony on the penalty of perjury. The third, though it is not sworn, sits squarely within the type of communication contemplated by the rules of civil procedure as part of a court proceeding. See CR 45(c)(2)(B) (providing ability to object to subpoena,

17

triggering issuer's ability to move the court to compel production). The statements are all pertinent to the subject matter of the litigation, since they concerned arguments about the admissibility of a copy of a will in actions about the disposition of the decedent's property. And any falsity in the statements was subject to checks by the trial court, such as sanctions, or even by the Washington State Bar Association through a disciplinary action.[9] As statements made in the course of court proceedings, pertinent to the subject matter of the litigation, the defendants cannot be civilly liable for any harm the statements caused.

Young disagrees, arguing about the statements' pertinency. He asserts that the dispute over whether he fraudulently obtained the will, and whether the will should have been stricken from the record as a result, did not "address the contents of the will nor the merits of the underlying litigation." But this and other similar arguments parse the matter too finely. As case law and other authority have repeatedly held, litigation privilege cannot be applied only where statements are truly relevant to the determination of an issue. See, e.g., RESTATEMENT § 586, comment c; McNeal, 95 Wn.2d at 267 (Statements "are absolutely privileged if they are pertinent or material to the redress or relief sought, whether

---

[9] Additionally, "[a] person is guilty of perjury in the first degree if in any official proceeding he or she makes a materially false statement which he or she knows to be false under an oath required or authorized by law." RCW 9A.72.020(1). Perjury charges are thus, theoretically, another potential check on false testimony. Practically, though, it would be highly unusual for criminal charges to be brought based on sworn statements made in a civil case with no major public import.

or not the statements are legally sufficient to obtain that relief."). To apply the privilege so narrowly could result in a chilling effect as attorneys and parties become reluctant to make less than certain arguments, and witnesses become uncomfortable giving testimony without understanding the use to which it will be put. We are not swayed by Young's argument.

### Young's Civil Conspiracy Claim

Application of the litigation privilege doctrine to civil conspiracy is slightly more involved than its application to defamation and false light. This is because the tort of civil conspiracy does not necessarily locate liability in defendants' statements, as opposed to their actions. But we nonetheless conclude that litigation privilege also bars consideration of this claim.

"[C]ivil conspiracy exists if two or more persons combine to accomplish an unlawful purpose or combine to accomplish some purpose not in itself unlawful by unlawful means." Corbit v. J.I. Case Co., 70 Wn.2d 522, 528, 424 P.2d 290 (1967). "In order to establish a conspiracy the plaintiff must show that the alleged coconspirators entered into an Agreement to accomplish the object of the conspiracy." Corbit, 70 Wn.2d at 528-29.

The plaintiff must demonstrate the existence of the conspiracy by clear, cogent, and convincing evidence. Corbit, 70 Wn.2d at 529. As Young notes, " '[t]o establish liability for conspiracy, it is sufficient if the proof shows concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt act was committed in furtherance of a common design,

19

No. 84426-1-I/20

intention, and purpose of the alleged conspirators.' " Lyle v. Haskins, 24 Wn.2d 883, 899, 168 P.2d 797 (1946) (quoting 11 AM. JUR. CONSPIRACY § 56 at 585 (1937)). But this is not to say that any circumstantial evidence suffices. " 'Mere suspicion or commonality of interests is insufficient to prove a conspiracy.' " Puget Sound Sec. Patrol, Inc. v. Bates, 197 Wn. App. 461, 470, 389 P.3d 709 (2017) (quoting All Star Gas, Inc. v. Bechard, 100 Wn. App. 732, 740, 998 P.2d 367 (2000)). And if " 'the facts and circumstances relied upon to establish a conspiracy are as consistent with a lawful or honest purpose as with an unlawful undertaking, they are insufficient.' " Puget Sound Sec. Patrol, 197 Wn. App. at 470 (quoting All Star Gas, 100 Wn. App. at 740).

> Young's complaint describes the alleged conspiracy:
>
> Defendants Penny Rohr, Samuel Wilkens and Todd Rayan combined to accomplish an unlawful purpose, i.e., defame plaintiff and present him in a false light, or they combined to accomplish a lawful purpose by unlawful means, e.g., by attempting to avoid blame for their release of Robert Parman's will to plaintiff.
>
> . . .
>
> The conspirators entered into an agreement to accomplish the object of the conspiracy and knowingly made false allegations about plaintiff with the purpose of exonerating themselves in the eyes of their employer, the Firm.

Insofar as Young attempts to show a conspiracy of the sort that seeks to accomplish an unlawful purpose, the only unlawful purposes he identifies are defamation and false light. Since litigation privilege protects the defendants from liability on those claims, they cannot serve as the basis for his civil conspiracy claim.

20

No. 84426-1-I/21

But Young's alternative framing of the conspiracy likewise depends on "false allegations" made by Rohr, Wilkens, and Rayan. It does not appear that he is referencing anything other than the statements protected by litigation privilege.[10] Because his civil conspiracy claim, like his other claims, inherently relies on the falsity of privileged statements to demonstrate liability, we conclude that the trial court correctly dismissed this claim as well.

Young asserts that there exists a "larger actionable conspiracy" exception to litigation privilege that would allow this claim to move forward because the litigation privilege does not protect conspiratorial use of perjury to accomplish other ends. But the binding cases he cites do not support this proposition, and we decline to hold that any such exception applies here.

For support in Washington caselaw, Young cites Dexter v. Spokane County Health District, 76 Wn. App. 372, 884 P.2d 1353 (1994). That case uses the phrase " 'larger[] actionable conspiracy' " only once, during its discussion of

---

[10] Elsewhere, Young characterizes the conspiracy to involve more than just collusion among the named defendants, but having the same object of creating false testimony:

> The greater conspiracy here was threefold: (1) Wilkens attempted to excuse his apparent violation of RPC 1.6 in releasing the will by blaming the release on Young; (2) the Althauser firm attempted to avoid liability for its apparent violation of RPC 1.6 and for not having procedures in place to prevent such a release by blaming Young; and (3) Gabrielson (on behalf of his ultimate client Shawn Parman) "ignored" the RPC 1.6 violation and gained an advantage over Young in the underlying litigation by putting Young in a false light, attacking him personally, undermining his credibility, driving a wedge between Young and his client, and perhaps hiding the will of Robert Parman which had unexpectedly come to the light of day.

21

whether Washington recognizes a civil cause of action for perjury. Dexter, 76 Wn. App. at 375 (quoting Anderton v. Herrington, 113 Idaho 73, 741 P.2d 360 (Ct. App.1987)). Surveying case law from other states, Dexter concluded that most jurisdictions do not allow for a common law right of action arising out of perjured testimony. 76 Wn. App. at 375. It noted, however, that some jurisdictions create an exception to this general rule where perjury is "merely a 'step in the accomplishment of some larger, actionable conspiracy.' " Dexter, 76 Wn. App. at 375 (quoting Anderton, 113 Idaho at 741.). But that exception did not apply in Dexter, which went on to state: "Mr. Dexter is left with the general rule that absent an authorizing statute, there is no civil claim for perjury." 76 Wn. App. at 375.

On its face, the exception Young seeks to identify in Dexter is not an exception to the litigation privilege doctrine at all but instead an exception to the general rule that no civil cause of action exists for perjury. And in fact, Dexter declined to allow the plaintiff's suit to proceed in part because "[a] cause of action for perjury is inconsistent with the principle that a witness, lay or expert, party or nonparty, is immune from tort damages arising out of his or her testimony." 76 Wn. App. at 376.

Young does not point to any other Washington law that supports his claim, instead relying on out-of-state or federal cases, primarily FMC Technologies, Inc. v. Edwards, 464 F. Supp. 2d 1063, 1068 (W.D. Wash. 2006). The court there, citing Dexter and a series of non-Washington cases, concluded that Washington

22

*does* recognize a "larger actionable conspiracy" exception to the litigation privilege doctrine. Edwards, 464 F. Supp. 2d at 1068-72. The court reasoned that broad statements about the protection afforded by litigation privilege were drawn from cases decided before the privilege was extended beyond defamation actions alone, in 1989's Bruce decision. Edwards, 464 F. Supp. 2d at 1070. In doing so, however, it ignored similarly broad language in later cases. See, e.g., Deatherage, 134 Wn.2d at 135 (saying in 1997 that the privilege "applies to statements made in the course of judicial proceedings and acts as a bar to any civil liability"). Edwards appears to have applied out-of-state law while presenting it as Washington law. See 464 F. Supp. 2d at 1068-69 (citing cases from Tennessee to explain the conspiracy exception).

Regardless of the merit of a "larger actionable conspiracy" exception, the case law Young cites does not support the notion that existing Washington law recognizes it.

We affirm.

_____
Smith, C.J.

WE CONCUR:

_____          _____
Hazelrigg, A.C.J.                Dwyer, J.

23