IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| HARLEY FRANCO; HMS PARTNERS, LLC,<br><br>  Appellants,<br><br>  v.<br><br>MACQUARIE CAPITAL (USA) INC.; MACQUARIE MARINE SERVICES, LLC; and MIHI, LLC; MATT GODDEN; TOBIAS BACHTELER,<br><br>  Respondents,<br><br>  and<br><br>HMS HOLDINGS 1 LLC; HMS HOLDINGS 2, LLC US; HMS HOLDINGS 3, LLC US; and HARLEY MARINE SERVICES, INC.,<br><br>  Nominal Respondents. | No. 84292-7-I<br><br>DIVISION ONE<br><br>ORDER DENYING MOTION FOR RECONSIDERATION, DENYING MOTION TO PUBLISH, AND AMENDING OPINION |

Appellants Harley Franco, et al. filed a motion for reconsideration of and a motion to publish the opinion filed on May 6, 2024 in the above case. Respondents MacQuarie Capital, et al. filed answers to both. A majority of the panel has determined that the motions should be denied. Now, therefore, it is hereby

ORDERED that the motion for reconsideration and motion to publish are denied. The opinion filed on May 6, 2024, shall be amended as follows:

1. On Page 20, the following sentences:

   Simmons testified that she had taken notes during Handen's call "on the little white pad of paper that's next to your bed in the . . . hotel."

   shall be deleted and replaced with the following:

   Simmons testified that in February 2019, she went to Seattle to meet with the Francos. Bryan Tsu of PIMCO, the largest creditor of HMS, called her at about 7:30 in the morning and asked her to "try to broker a truce between the Francos and Macquarie." When she met with the Francos later that day, she brought "the notes that I had taken on the little white pad of paper that's next to your bed in the . . . hotel" and showed them to the Francos. She further testified that after she met with the Francos, Tsu called and asked her to call Handen. She testified that she did so, and during their call, Handen was "furious," "livid," and screaming that Franco was "a crook, a tax fraud, and a cheat, and he was going to go to jail, and he was going to be behind bars in an orange jumpsuit." She stated that it was "the most unprofessional conversation I've ever had since 1972 and one that I will never forget."

The remainder of this opinion shall remain the same.

FOR THE COURT:

_Chung, J._

Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| HARLEY FRANCO; HMS PARTNERS, LLC, | No. 84292-7-I |
| Appellants, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| MACQUARIE CAPITAL (USA) INC.; MACQUARIE MARINE SERVICES, LLC; and MIHI, LLC; MATT GODDEN; TOBIAS BACHTELER, | |
| Respondents, | |
| and | |
| HMS HOLDINGS 1 LLC; HMS HOLDINGS 2, LLC US; HMS HOLDINGS 3, LLC US; and HARLEY MARINE SERVICES, INC., | |
| Nominal Respondents. | |

CHUNG, J. — Harley Franco, Chief Executive Officer (CEO) of Harley Marine Services (HMS), sued his corporate business partner, MacQuarie Capital, related companies, and two members of HMS's board. A jury tried his claims of breach of contract, breach of fiduciary duties, tortious interference with his employment contract, and defamation.

The jury found in favor of MacQuarie on the breach of fiduciary duties and breach of contract claims and for Franco on his defamation and tortious interference with contractual relations claims. The jury also found by a special verdict that a single statement from the Delaware lawsuit both defamed Franco and was the improper means by which MacQuarie tortiously interfered with his employment contract. Because that statement was made in the course of litigation, the court ruled that the litigation privilege applied and directed the verdict on both the defamation and tortious interference claims for MacQuarie.

Franco appeals the directed verdict. Franco also challenges the court's refusal to give a proposed instruction regarding dual fiduciaries and its rulings relating to a third-party witness's notes, including an instruction Franco claims was a comment on that witness's credibility. Finally, Franco challenges the court's exclusion, based on attorney-client privilege, of evidence relating to an investigation that led to his termination. Finding no error, we affirm.

## FACTS

Franco founded HMS in 1987 starting from just one tugboat. The company provided maritime transportation services to oil companies such as Phillips 66, Tesoro, BP, and Chevron, and shipping companies Maersk and Matson.

MacQuarie Capital (USA) Inc. (MacCap), an investment and merchant bank, supplied capital for HMS's growth through its subsidiary, MacQuarie Marine Services LLC (MMS). MMS bought a 49 percent interest in HMS for $48 million in 2008.

In 2013, HMS took a payment-in-kind (PIK) loan from MacCap subsidiary MIHI.[1] By December 2017, the interest on the PIK loan had reached $94 million, and MacQuarie[2] "wanted a liquidity event" because it had held its financial position in HMS for a "very, very long" time.

At the beginning of 2018, according to Franco, HMS Chief Operating Officer (COO) Matthew Godden asked Franco "to turn over the presidency and make [him] CEO." Franco refused. At that time, Franco was focused on a sale of bonds to retire the company's debt. Godden testified that this securitization was a "turning point for the company," and the board was "focus[ed] on cost cutting and getting the business performing [and] headed [in] the right direction." But within two weeks of the transaction, Franco was taking actions that caused Godden concern, such as increasing rates paid to himself for properties and vessels the company leased from him. These concerns led Godden to text Tobias Bachteler on May 29, saying he was going to resign from HMS. Bachteler was MacCap's COO, an MMS director, and a Vice President at MIHI, a MacQuarie entity that acted as agent for all lenders to HMS. Bachteler found this "shocking" and asked Godden not to resign and instead to come to New York to talk. In his meeting with Bachteler, Godden accused Franco of various improprieties involving Franco's personal expenses, deals with friends and family, and other boats that he was attempting to build.

---

[1] A PIK loan allows a debtor to either pay periodic interest or have that interest added to the debt principal.

[2] This opinion refers to the respondents MacCap, MMS, MIHI, Godden, and Bachteler collectively as "MacQuarie" unless it is necessary to refer to a particular respondent.

MacQuarie then hired forensic accountants AlixPartners to look into the issues Godden raised. At the end of June 2018, MacQuarie told Franco it was prepared to file a "verified complaint" alleging that Franco had not only embezzled large sums of money from HMS, but was destroying evidence of the misconduct. At the beginning of July, MacQuarie asked Franco to temporarily step aside. Franco's response was to file a lawsuit in King County on July 2, 2018. He sued MacCap, MMS, and MIHI for breach of fiduciary duties and declaratory relief.

On July 3, 2018, AlixPartners sent its report to MacQuarie. Based on that report and declarations from Godden and HMS's former interim Chief Financial Officer, MMS sued Franco derivatively on behalf of one of HMS's holding companies, Holdco1, in Delaware's Court of Chancery that same day. On July 5, HMS directors Bachteler and Godden held a conference call without Franco or the other Franco-appointed director and decided to terminate Franco as HMS CEO for cause.[3] On the same day, MMS voluntarily dismissed its Delaware suit against Franco.

Back in King County, on July 6, Franco obtained a temporary restraining order declaring that he remained President and CEO of HMS. He also amended his complaint to add Godden and Bachteler as defendants and claims for breach of the duty of care and breach of contract.

---

[3] After the 2013 refinancing, HMS remained governed by a board of four directors. Franco appointed two, MMS appointed Tobias Bachteler, and the fourth was an independent director, Matthew Godden. These four were the directors at the time of the July 5 termination decision.

4

In January 2019, HMS's board placed Franco on temporary administrative leave pending an internal investigation. The two independent directors of HMS[4] engaged employment attorney Russ Perisho to investigate and advise them. Following the investigation, in March, the two independent directors and the MMS-appointed director, Bachteler, voted to terminate Franco.

Thereafter, in March 2019, Franco filed a second amended complaint alleging breach of fiduciary duty, breach of contract, tortious interference with contractual relations, intentional infliction of emotional distress (IIED), defamation, and declaratory judgment. He also added HMS Partners LLC (HMSP) as his co-plaintiff; that entity held Franco's interest in HMS.[5]

MacQuarie moved to dismiss the complaint in April 2019. The court granted the motion in part, dismissing the tortious interference and defamation claims as to HMSP and the IIED and declaratory judgment claims.

Two years later, in June 2021, MacQuarie moved for summary judgment on the remaining claims. The court granted the motion in part and dismissed a tortious interference claim involving two contracts not at issue here. However, the court denied MacQuarie's motion regarding the complaint's remaining claims for breach of contract, breach of fiduciary duty, defamation, and tortious interference with Franco's employment agreement.

---

[4] Two independent directors replaced Godden when he resigned from the board in November 2018.

[5] Franco also added several HMS holding companies as nominal defendants, along with previously named defendants MacCap, MMS, MIHI, Godden, and Bachteler.

In both its motion to dismiss and its motion for summary judgment, MacQuarie argued that its statements in the Delaware litigation were protected by the litigation privilege, so to the extent any claim by Franco[6] relied on statements from its complaint in that case, they should be dismissed. The court denied both motions as to the litigation privilege, reasoning that "[t]he statements in the Delaware litigation may very well be privileged, however, the court agrees with the plaintiffs that filing a case, making potentially defamatory statements in that case, then dismissing the case as a matter of right before a court could take any action concerning statements, may defeat any litigation privilege."

Subsequently, Franco raised the issue of the litigation privilege on the eve of trial, in May 2022.[7] On May 9, before beginning jury selection later that same day, the court ruled that "there is no litigation privilege because the complaint was dismissed and the Delaware Court [of Chancery] did not retain the power to supervise, discipline, or sanction any party."

After trial commenced, MacQuarie moved for reconsideration of the ruling that the litigation privilege did not apply. The court granted MacQuarie's motion. Franco complained that he "shaped [his] entire case . . . in reliance on this [c]ourt's pre-trial ruling that no litigation privilege applied." Franco proposed that the jury should not be instructed on the litigation privilege, that all his claims

---

[6] We use "Franco" to refer to both Franco and HMSP when discussing appellants' arguments.

[7] Plaintiffs raised the issue in a brief "re issues for the court's consideration" filed on May 6, stating that "[t]he [c]ourt has already ruled Defendants are **not** protected by that privilege" and "that the litigation privilege did not apply as a matter of law." Plaintiffs then submitted another memo, on May 9, regarding the privilege that again argued the earlier ruling was correct because MacQuarie waived the privilege by voluntarily dismissing its suit.

should be submitted to the jury, and that the jury should be asked to separately award damages for each claim. Franco suggested that then, assuming the jury found for him on his defamation claim, the court would be able to grant a judgment notwithstanding the verdict on that claim.

To mitigate MacQuarie's objection that it would be impossible to determine whether a verdict on the defamation or tortious interference claim was based on a statement covered by the litigation privilege, the court adopted Franco's proposal that the jury complete a detailed verdict form that required them to specifically identify each defamatory statement.

The jury found in favor of MacQuarie on Franco's claims for breach of fiduciary duties and breach of contract. It returned verdicts in favor of Franco for defamation and tortious interference "by defamation," finding MacCap, MMS, and Bachteler each liable.

On the special verdict form, the jury identified a single statement by MMS made in the "Delaware filing" as defamatory: "page 6 #17: 'In short, Franco stole two significant company assets – tow winches with a collective value of $1,225,253 – by including them in a sale transaction involving two personal entities.' " The special verdict form then asked, "Has Mr. Franco proven that one or more Defendants acted in concert with one another on his claims for defamation?", to which the jury answered "yes." In response to the prompt, "If Yes, identify which Defendant(s)," the jury identified MMS, MacCap, and Bachteler.

Next, the jury found Franco had proven the elements of tortious interference with contractual relations. In response to the question "what are the improper mean(s) and/or improper purpose(s) you found supporting this [tortious interference] claim?", the jury answered, "Jury instruction 26(a): defaming Mr. Franco." The jury found the same three defendants, MMS, MacCap, and Bachteler, had acted in concert to tortiously interfere with Franco's employment contract.

The jury awarded Franco total damages of $75.1 million for both the defamation and tortious interference claims. However, because the jury's special verdict form identified the defamatory statement as one protected by the litigation privilege, the court granted MacQuarie's motion for a directed verdict on the claims of defamation and tortious interference.

The court denied Franco's motions to amend the judgment and for reconsideration. Franco timely appeals.

DISCUSSION

On appeal, Franco challenges the following rulings by the trial court: (1) directing the verdict on his claims of defamation and tortious interference with contractual relations based on the litigation privilege; (2) declining to give his proposed jury instruction regarding the duty of a dual fiduciary; (3) giving a jury instruction about a witness and her notes; and (4) admitting evidence of an investigation by attorney Perisho that MacQuarie had claimed was privileged during discovery. We address each in turn.

8

I.     Application of the Litigation Privilege

Franco argues the court erred by directing the jury's defamation and tortious interference verdicts for MacQuarie and declining to reinstate those verdicts in his favor. The assignments of error concern the scope of the litigation privilege and whether MacQuarie waived the privilege.

We review the application of the privilege de novo. Deatherage v. State, Examining Bd. of Psychology, 134 Wn.2d 131, 135, 948 P.2d 828 (1997). "The purpose of the litigation privilege doctrine is to encourage frank, open, untimorous argument and testimony and to discourage retaliatory, derivative lawsuits." Young v. Rayan, 27 Wn. App. 2d 500, 509, 533 P.3d 123 (2023), review denied, 2 Wn.3d 1008 (2023).

The doctrine addresses the concern that witnesses may either be reluctant to come forward to testify in the first place or shade their testimony "and thus deprive the finder of fact of candid, objective, and undistorted evidence." Briscoe v. LaHue, 460 U.S. 325, 333, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983). While it often arises in the context of a defamation suit, "the chilling effect of subsequent litigation 'is the same regardless of the theory on which that subsequent litigation is based.' " Young, 27 Wn. App. 2d at 510 (quoting Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc., 113 Wn.2d 123, 132, 776 P.2d 666 (1989)).

"The rule assumes that false or harmful statements in a judicial proceeding may be addressed through the use of tools such as sanctions, contempt, '[a] witness' . . . oath, the hazard of cross-examination, and the threat

of prosecution for perjury.' " Young, 27 Wn. App. 2d at 510 (quoting Bruce, 113 Wn.2d at 126). "In part because the privilege assumes that improper conduct should not be entirely impossible to address, immunity is not usually extended to settings where judicial authority lacks 'the power to discipline as well as strike from the record statements which exceed the bounds of permissible conduct.' " Id. (quoting Twelker v. Shannon & Wilson, Inc., 88 Wn.2d 473, 476, 564 P.2d 1131 (1977)).

Nonetheless, the Washington Supreme Court has used broad language to describe the privilege's scope. Id. "The defense of absolute privilege generally applies to statements made in the course of judicial proceedings and acts as a bar to any civil liability." Deatherage, 134 Wn.2d at 135. Specifically, "[s]tatements 'are absolutely privileged if they are pertinent or material to the redress or relief sought, whether or not the statements are legally sufficient to obtain that relief.' " Young, 27 Wn. App. 2d at 509 (quoting McNeal v. Allen, 95 Wn.2d 265, 267, 621 P.2d 1285 (1980)). But statements having "no connection whatever" with the litigation are not privileged. RESTATEMENT (SECOND) OF TORTS § 586 cmt. c (Am. Law Inst. 1977), quoted in Demopolis v. Peoples Nat'l Bank of Wash., 59 Wn. App. 105, 110, 796 P.2d 426 (1990). Connection is not a high bar; a statement "need not be strictly relevant to any issue" so long as it bears "some reference to the subject matter of the . . . litigation." RESTATEMENT (SECOND) § 586 cmt. c, quoted in Young, 27 Wn. App. 2d at 509.

Here, Franco argues that MMS, not MacCap, filed the suit in Delaware, and because MacCap was neither a party nor a witness in the Delaware

10

proceeding, it cannot be immunized by the litigation privilege and is liable for its concerted action with MMS, as the jury found. MacQuarie disagrees and argues that if MacCap did not make the statements, it cannot be held liable for making them, or, alternatively, if MacCap *did* make those statements, then MacCap is covered by the litigation privilege. We conclude that the privilege applies because the sole statement the jury found was the basis for the defamation and tortious interference claims was made in the course of a judicial proceeding and cannot be the basis for any liability in a collateral case.

Franco argues that the litigation privilege shields the defamer, not the statement, but cites no Washington authority in support. Instead, Franco cites an 1876 case from Massachusetts for the proposition that the litigation privilege does "not apply to a stranger to the suit." But in that case, the acts that were the basis for liability, subornation of perjury, were not statements made in a legal proceeding. Rice v. Coolidge, 121 Mass. 393, 394 (1876). A wife had sued her husband for divorce in Iowa based on alleged adultery, and the woman with whom the adultery was alleged then sued defendants in Massachusetts for suborning false testimony to support the adultery charges. Id. Like the statement at issue in the present case, the perjured statements in Rice were protected by the litigation privilege. Id. at 395. However, as to the third parties' acts suborning the perjured statements, the Rice court held, "[T]hese reasons [justifying the litigation privilege] do not apply to a stranger to the suit, who procures and suborns false witnesses, and the rule should not be extended beyond those cases which are within its reasons." Id.

11

Franco also points to the court's reasoning in a 1939 federal case, Ewald v. Lane, that if A induces B to act, "the fact that the law gives an immunity to B need not make A immune." 104 F.2d 222, 224 (D.C. Cir. 1939). In Ewald, a married woman sued several defendants, including her husband, for defamation by making false charges of adultery against her in a divorce proceeding. Id. at 222. The issue was whether the defendants other than the husband were subject to liability if they were alleged to be co-conspirators with the husband, who the plaintiff conceded was immune from suit. Id. at 222. But in Ewald, the court noted that "each defendant took part in the process of calumny," so "the question was whether to hold third parties liable for their *own acts*." Id. at 223 (emphasis added).

Here, while MacCap was not a party to the Delaware action, unlike in Ewald or in Rice, where the basis for liability was defendants' own separate acts outside of the judicial proceedings (calumny and suborning perjury, respectively), MacCap did not engage in any act separate from the Delaware lawsuit that is the basis for its liability.[8] Instead, the only basis the jury found for MacCap's liability for both defamation and tortious interference with contractual relations was the statement about two tow winches Franco "stole," which was made in the "Delaware filing"[9]—that is, in the course of judicial proceedings. And the

---

[8] To the extent MacCap may be vicariously liable for MMS's acts, MacCap's liability is predicated on MMS being liable. RCW 4.22.030 (if more than one person is liable . . . the liability of such persons shall be joint and several).

[9] Franco also argues that Laun v. Union Elec. Co. of Mo., 166 S.W.2d 1065 (1942), supports him. In Laun, defendants provided allegedly false information to two individuals, who

statement was pertinent to the relief MMS sought in the Delaware action as it was part of the factual basis for MMS's claims against Franco.

Under Washington law, the privilege is absolute and "applies to statements made in the course of judicial proceedings and acts as a bar to *any* civil liability." Deatherage, 134 Wn.2d at 135, quoted in Young, 27 Wn. App. 2d at 510-11 (emphasis added in Young); Twelker, 88 Wn.2d at 475 ("The defense of absolute privilege applies to *statements* made in the course of judicial proceedings and avoids all liability.") (emphasis added).[10]

Franco also argues that "[b]ecause no public policy is advanced by extending immunity to MacCap—a non-participant to the litigation acting in concert with a party—the [c]ourt should hold it is not entitled to absolute immunity." Franco relies on Mason v. Mason, in which Division Two suggested a

_____

then incorporated the information into an amended complaint filed in federal district court against plaintiff. See Murphy v. A.A. Mathews, a Div. of CRS Grp. Eng'rs, Inc., 841 S.W.2d 671, 676 (Mo. 1992) (examining Laun). As discussed in Murphy, the Laun court refused to absolutely immunize the defendants and held that the "plaintiff could recover if he proved the defendants' statements were not in good faith but were instead willfully and knowingly used for the purpose of defamation." Id. at 677. As the Missouri Supreme Court recognized, Washington's witness immunity law and Missouri's are not the same: our law has extended the privilege, where Missouri law allows only a narrow restriction. See id. at 678, 680. Regardless, unlike the present case, where the defaming statements were made in a judicial proceeding, the statements at issue in Laun were made to other parties who subsequently sued Laun. Laun, 166 S.W.2d at 1071. The Laun court reversed the lower court's application of the litigation privilege because it "should not be extended so as to include the instant defendants and the position they are alleged to occupy in the circumstances." Id. (citing reasoning from Rice and Ewald).

[10] MacQuarie argues Franco's arguments are barred by the invited error doctrine because it never distinguished among the defendants in argument about the litigation privilege and it was plaintiffs who proposed that the jury not be instructed about the privilege and the court direct a verdict if the jury relied on the Delaware complaint to find the defendants liable. Under the invited error doctrine, a party may not materially contribute to an erroneous application of law at trial and then complain of it on appeal. In re A.L.K., 196 Wn.2d 686, 694-95, 478 P.3d 63 (2020). To determine whether the doctrine applies, the court considers whether the defendant affirmatively assented to the error, materially contributed to it, or benefited from it. Id. at 695. However, as we resolve the litigation privilege issue on the merits, we do not reach the issue of invited error.

13

third element to the litigation privilege analysis: whether immunity furthers public policy under the particular facts of the case. 19 Wn. App. 2d 803, 834, 497 P.3d 431 (2021), review denied, 199 Wn.2d 1005, 506 P.3d 638 (2022); see also Scott v. Am. Express Nat'l Bank, 22 Wn. App. 2d 258, 265-66, 514 P.3d 695, review denied, 200 Wn.2d 1021, 520 P.3d 976 (2022).

However, more recently, in Young, we declined to follow Mason, stating that we "do not recognize a case-by-case 'public policy exception' to the litigation privilege doctrine that looks to a defendant's intent." Young, 27 Wn. App. 2d at 514. In Young, we explained that as our Supreme Court reasoned, "the privilege already serves a compelling public policy in any given case as it is currently constituted: it ensures that witnesses, parties, and their counsel may speak freely and openly in court proceedings without fear of ensuing litigation." 27 Wn. App. 2d at 514 (citing Deatherage, 134 Wn.2d at 137).[11] As Young is based on our Supreme Court precedent and we agree with its sound reasoning, we reject Franco's arguments based on public policies specific to this case.

---

[11] Franco contends that Washington State policy makes tortfeasors who act in concert jointly and severally liable, the law should provide a remedy to the injured, and MacCap and MMS are separate entities. Even without examining a third element of the litigation privilege as suggested in Mason, Mason and Scott are distinguishable. In Mason, where plaintiff's claims against her former husband included abuse of process and emotional distress, the court reasoned the litigation privilege did not apply to her former husband and his attorney allegedly conspiring to file to modify their parenting plan as a means to control and abuse her, as such a purpose was not pertinent to modifying a parenting plan. 19 Wn. App. 2d at 840 (abuse of process claim), 843 (intentional infliction of emotional distress claim). Here, the statement the jury found to be defamatory was part of, and pertinent to, the Delaware complaint. In Scott, the court declined to apply the privilege to a law firm that was acting in its capacity as a collection agency when conducting the acts upon which its liability under the Washington Consumer Protection Act was allegedly based. 22 Wn. App. 2d at 270. Here, Franco's claim was defamation, so the defendants' liability hinged on statements, not conduct, as in Scott.

Finally, Franco argues that because MMS voluntary dismissed its complaint, the Delaware court could not have issued any sanctions, and, therefore, the litigation privilege "does not apply even as to MMS." This argument is based on Delaware Chancery Court Rule 11(c)(1)(A), which allows a party to avoid sanctions by withdrawing or amending a filing within 21 days. Franco argues that "[e]ven if the Delaware court had theoretical authority to sanction MMS *sua sponte,* such authority was exceedingly unlikely to be exercised," and thus, the litigation privilege should not apply.

This argument is unavailing. Franco provides no authority that allows such an exception to the litigation privilege. To the contrary, in <u>Young</u>, we emphasized that

> [T]he privilege, by design, applies where bad behavior may be addressed through means not always available outside the courtroom, such as sanctions, contempt, striking of testimony, cross-examination, the threat of perjury, and professional discipline. And the effects of improper statements on the progress of the lawsuit in which they are made may be addressed through direct appeal if the trial court errs in its approach. Those harmed by privileged statements are correspondingly not without recourse, even if redress is imperfect. The litigation privilege accepts that imperfection in pursuit of freer speech and conduct in judicial proceedings.

27 Wn. App. 2d at 514-15. Thus, we do not consider whether, in a particular case, a court actually could or did sanction the "bad behavior" that is immunized by the privilege.[12]

---

[12] Franco relies on only one case from another jurisdiction for the proposition that the Delaware court's ability to sanction was limited, <u>Pino v. Bank of New York</u>, 121 So.3d 23, 43 (Fla. 2013). In rejecting Franco's claim that the privilege should not apply because MMS dismissed its complaint, the trial court noted that under Delaware's Rule 11(c)(1)(B), sanctions may be

In sum, because the jury found MMS, MacCap, and Bachteler joint tortfeasors liable for defamation and tortious interference with contractual relations solely based on a statement made in, and pertinent to, MMS's Delaware lawsuit, the statement is absolutely privileged. The trial court did not err in directing the verdict in the MacQuarie defendants' favor on the defamation and tortious interference claims.

II.      Dual Fiduciary Jury Instruction

Franco argues the court erred by not instructing the jury about the duty of a dual fiduciary. MacQuarie counters that Franco's proposed instruction misstated Delaware law and the jury was properly instructed without it. We agree with MacQuarie.

"Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law." Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996), quoted in Hendrickson v. Moses Lake Sch. Dist., 192 Wn.2d 269, 280, 428 P.3d 1197 (2018). We review de novo a trial court's refusal to provide a requested jury instruction where the refusal is based on a ruling of law, but a court's refusal to give an instruction based on factual reasons is reviewed for an abuse of discretion. State v. Arbogast, 199 Wn.2d 356, 365, 506 P.3d 1238 (2022) (citations omitted).

---

imposed even after claims are withdrawn. See Fairthorne Maint. Corp. v. Ramunno, No. 2124-VCS, 2007 WL 2214318, at *10 (Del. Ch. July 20, 2007) (unpublished).

16

We must reverse if an instruction erroneously states the law and prejudices a party. Hendrickson, 192 Wn.2d at 281. But a "trial court need never give a requested instruction that is erroneous in any respect." Vogel v. Alaska S.S. Co., 69 Wn.2d 497, 503, 419 P.2d 141 (1966), quoted in Hendrickson, 192 Wn.2d at 278.

Franco argued that a dual fiduciary instruction was necessary because as a board member of both HMS and its holding companies, such as Holdco1, and MIHI, Bachteler owed conflicting fiduciary duties. In January 2019, MIHI sued HMS's parent, Holdco1, to foreclose on its PIK loan to HMS. The directors of Holdco1, including Bachteler, were the same as the directors of HMS. At a February 2019 board meeting, the directors failed to pass a motion to defend against MIHI's suit. Because HMS failed to defend, MIHI obtained a $68 million default judgment, and Holdco1's sole assent, its HMS stock, was sold at auction.

Franco claimed Bachteler breached his fiduciary duties because of his role on the HMS board and his decision that HMS should not defend against MIHI's lawsuit. Franco's proposed instruction stated:

> A dual fiduciary conflict exists if an individual owes multiple fiduciary obligations and the interests associated with those obligations are not aligned. Such a situation creates an inherent conflict of interest. There is no safe harbor for such divided loyalties. A fiduciary who takes action in such circumstances breaches fiduciary duties.

The trial court declined to give this proposed instruction, reasoning that the instruction as proposed amounted to a directed verdict on Franco's claim of breach of fiduciary duty by Bachteler. Instead, it instructed the jury regarding

17

fiduciary duties, who owed fiduciary duties, and the business judgment rule, i.e., the presumption that, when making a business decision, directors are presumed to have acted in good faith and, if the presumption is rebutted, the burden shifts to a director who must then prove entire fairness.

Delaware law provides that "[t]here is no 'safe harbor' for such divided loyalties in Delaware." Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983). However, "[w]hen directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." Id. Franco argues that "[t]he *mere existence* of such a dual fiduciary conflict rebuts the business judgment rule's presumption, and requires the dual fiduciary to prove the transaction was entirely fair." Br. of Appellant at 44. This argument states the law correctly, but that is not the statement of law in Franco's proposed Instruction 12.

Instead, proposed instruction 12 stated that a dual fiduciary was an "inherent conflict of interest" and any "action in such circumstances breaches fiduciary duties." Franco knew this was incorrect: at oral argument on his proposed instruction, he offered to remove the proposed instruction's last sentence.

Moreover, the court's instructions, taken as a whole, correctly stated Delaware law regarding fiduciary duties (instruction 11), who owed them (instruction 13), the business judgment rule, and entire fairness (instruction 15). See Hendrickson, 192 Wn.2d at 280. Therefore, the court properly refused to

18

give an erroneous statement of Delaware law, and its instructions, taken as a whole, properly instructed the jury regarding Delaware's fiduciary duty law.[13]

III.     Third Party Witness's Deposition Testimony and Notes

Carol Simmons is a consultant who was representing a competitor of HMS, Keystone Shipping, that offered to manage HMS. Franco had disclosed Simmons as a witness in 2019, during discovery. MacQuarie filed a pre-trial motion in limine to exclude Simmons's deposition testimony, and the court denied the motion. On appeal, Franco challenges the court's rulings and a jury instruction concerning Simmons's testimony and her notes, which were not produced until mid-trial.

Before trial, Simmons provided Franco with a declaration stating that a MacQuarie executive, Larry Handen, told her that Franco " 'was a crook and a criminal and that he would go to jail and be in an orange jumpsuit' " and that Handen "looked forward to visiting Mr. Franco on his first day in jail and laughing at him." Simmons's declaration stated that Handen threatened her and her client and "told us to stand down."

MacQuarie requested Franco to "[p]roduce all documents concerning or reflecting communications with Carol Simmons" in January 2020. While Simmons was Franco's witness, she was a third party to the litigation and represented by separate counsel. Because Simmons was a Florida resident, the court did not

---

[13] We need not address MacQuarie's argument that Bachteler was not conflicted in the first place because Holdco1 was an LLC and its bylaws enumerated interested decisions, which did not include decisions to retain counsel.

have subpoena power over her. Nevertheless, in February 2020, Simmons agreed to sit for a videotaped deposition, while she was in Pennsylvania. Simmons testified that she had taken notes during Handen's call on "the little white pad of paper that's next to your bed in the . . . hotel." While the parties dispute exactly why the deposition ended,[14] they agree that afterwards, Simmons's attorney sent a letter advising the parties that Simmons "will not appear voluntarily for another deposition in this matter." MacQuarie did not attempt to obtain the notes Simmons mentioned through subpoena.

MacQuarie moved in limine to exclude Simmons's deposition testimony as hearsay, irrelevant, and because of unfair prejudice under ER 403. In particular, it argued that Handen's alleged statements to Simmons were not admissible under the former testimony exception to the hearsay rule, ER 804(b)(1),[15] because MacQuarie "did not have an adequate opportunity to fully develop Simmons's testimony by cross examination." The court denied the motion in limine.

At trial, MacQuarie renewed its ER 804(b)(1) objection to Franco's playing Simmons's videotaped deposition for the jury. Franco responded that Simmons's

---

[14] MacQuarie contends Simmons requested that the deposition end because she "had a blood sugar issue." Franco suggests Simmons refused to voluntarily appear for another deposition because MacQuarie refused her a lunch break.

[15] ER 804(b) states as follows:

(1) *Former Testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

deposition was complete, and if not, it was MacQuarie's responsibility to reschedule it. Franco further argued that Simmons was unavailable because she was outside the court's subpoena power, and MacQuarie had chosen not to attempt to subpoena her testimony and agreed to close discovery. The court agreed with MacQuarie: "either she makes herself available . . . for one hour on a deposition, or – or she's not unavailable."

Thereafter, Simmons's second deposition took place during a recess from the trial on June 1, 2022. MacQuarie asked Simmons if she took notes during her call with Handen. She answered that she took "some at the time, and I took some later," and she had her notes with her. MacQuarie asked for the notes. Simmons's attorney said that he had the "email th[at] Ms. Simmons prepared" and that he would send it to the parties. This e-mail, which Simmons had sent to the chairman of the company she was representing, Keystone Shipping, described the call with Handen in detail and was dated February 24, 2019, three days after her call with Handen.

MacQuarie then asked Simmons if she had notes on a hotel pad. Simmons said she did and that she had them with her. MacQuarie asked for them, and Simmons's attorney said, "I will confer with counsel for the other side and see if they agree."

Back before the trial court, on June 8, 2022, MacQuarie reported that Simmons still refused to produce the hotel pad notes. Franco stressed that he did not control Simmons. The court acknowledged that MacQuarie should have subpoenaed the notes. Further, the court said that while it wanted to order

Simmons to produce the notes, recognizing it had no authority to do so, it "decided the way to handle it was through an instruction." The court stated: "Let me be clear that the remedy, if anything – I'm not going to preclude her testimony, but I may give an adverse inference instruction." The court asked MacQuarie's counsel to prepare an order, then Franco's counsel said he would "just call [Simmons's counsel] and see if he'll turn [the notes] over."

No notes were produced before Simmons's deposition testimony was played for the jury on June 8, 2022. That same day, during a break in playing Simmons's testimony to the jury, Franco advised the court that he had contacted Simmons's attorney, who promised to send the notes.[16]

Later that day, photographs of *two* sets of notes arrived by e-mail to Franco's attorney. The notes on a hotel pad do not corroborate Simmons's deposition testimony about Handen saying "crook," "criminal," "jail," and "orange jumpsuit." However, the other notes, the "loose-leaf" notes, do corroborate Simmons's testimony that Handen used those words.

The next day, June 9, 2022, MacQuarie objected that because Simmons's testimony at her first deposition mentioned only notes on a hotel pad, the loose-leaf notes were not authentic, and all of Simmons's testimony, or at least those portions regarding Handen, should be disregarded. The court asked Franco to "[s]uggest some remedy to me if it's not to tell the jurors to completely disregard

---

[16] Franco's counsel said he sent "the draft boil[er plate] order" and asked Simmons's attorney to "[p]lease comply with that." The court said that was "disconcerting" because the court said it wouldn't sign an order after it "had thought better of it and decided the way to handle it was through an instruction."

her testimony," because "[t]here is a prejudice here by [MacQuarie] not having [the notes] so he could cross-examin[e] [Simmons]." The court further explained that it "wanted the jury to have an opportunity for themselves to see as much of [Simmons] as they could and judge from it as they could."

Franco answered that the court could not "take [Simmons] out as a witness" because "[t]here is no authority for it. [MacQuarie] did not subpoena [Simmons]." Franco emphasized that he did not control Simmons. Then, MacQuarie suggested, and Franco agreed, that only the hotel pad notes should be admitted. Franco's counsel promised, "I won't say that there were other notes out there to try and make a different impression [at closing]." Ultimately, the court said it was "looking for remedies," and counsel for Franco answered:

> Here's the remedy. A remedy. The testimony is in.[17] The email, which we both saw for the first time that day and both could cross-examine her on, is in.[18] Her other notes, the long version [loose-leaf] notes are out. I will not mention them in closing. The other notes, the one from the [hotel] pads, are in.

The court asked MacQuarie if it wanted the hotel pad notes or an instruction that the witness would not voluntarily produce her notes. MacQuarie said it wanted both and it was "going to argue about it [at closing]." The court said "Okay," and Franco said, "That's fine. I've got no problem with that, Your Honor, given the circumstances."

---

[17] This refers to the video tape testimony from Simmons's first deposition, which had already been played to the jury.

[18] This refers to the e-mail Simmons wrote to Keystone Shipping on February 24, 2019, describing her call with Handen.

When the court instructed the jury the next day, it gave instruction 9 regarding certain exhibits that had limitations.[19] Section 2, titled "Notes of Carol Simmons," stated that "Ms. Carol Simmons would not voluntarily produce the notes that were referenced in her deposition testimony. Following court intervention, she produced the notes marked as Exhibit 1041," referring to the hotel pad notes.

At closing argument that same day, June 10, MacQuarie argued that Simmons's hotel pad notes did not corroborate her testimony. He explained that was why "the judge instructed you as part of her jury instructions – the only way we got it was by court intervention." Later in his closing, Franco stated that "the notes [MacQuarie] referred to were not the notes relating to the call . . . [Simmons] was referring to different notes." MacQuarie objected, and the court sustained the objection.

### A. Trial management and improper sanction

On appeal, neither party suggests a violation of CR 26 or CR 37. Instead, Franco argues that the court abused its inherent authority to sanction litigation conduct because it made no finding of bad faith before admitting the hotel pad notes, excluding the loose-leaf notes, and instructing the jury. MacQuarie argues there was no sanction, only trial management decisions, but if the court's decisions did constitute a sanction, the record adequately supports finding that

---

[19] For example, section 1 of the instruction dealt with an AlixPartners report. Section 3 dealt with demonstratives.

Franco acted in bad faith with respect to Simmons's notes. We conclude that Franco was not sanctioned.

Generally, trial courts have broad discretion to make a variety of trial management decisions, ranging from the mode and order of examining witnesses and presenting evidence, to the admissibility of evidence, and to maintaining the order and security of the courtroom. State v. Dye, 178 Wn.2d 541, 547, 309 P.3d 1192 (2013); ER 611. A court should ordinarily rely on court rules to control litigation conduct. Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 340 n.72, 858 P.2d 1054 (1993) (Fisons) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 50, 111 S. Ct. 2123, 2135, 115 L. Ed. 2d 27 (1991)). Trial courts also have " 'inherent authority to sanction litigation conduct . . . upon a finding of bad faith.' " Geonerco, Inc. v. Grand Ridge Properties IV, LLC, 159 Wn. App. 536, 544, 248 P.3d 1047 (2011) (quoting State v. S.H., 102 Wn. App. 468, 475, 8 P.3d 1058 (2000)). Such sanctions are appropriate " 'if an act affects the integrity of the court and, [if] left unchecked, would encourage future abuses.' " Geonerco, 159 Wn. App. at 544 (quoting S.H., 102 Wn. App. at 475 (internal quotation marks omitted)). " '[I]nappropriate and improper' is tantamount to a finding of bad faith," but if a trial court fails to enter a finding that amounts to bad faith, remand is required. S.H., 102 Wn. App. at 475 (quoting Wilson v. Henkle, 45 Wn. App. 162, 175, 724 P.2d 1069 (1986)).

We will not reverse a court's trial management decisions, even if we disagree, unless the decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Dye, 178 Wn.2d at 548. We review decisions

25

either denying or granting sanctions for an abuse of discretion. <u>Fisons</u>, 122 Wn.2d at 338.

Franco contends that the court abused its discretion because it made no finding of bad faith, and, even if Simmons changed her mind and refused to send the notes, that is "not even bad manners, much less bad faith," because Simmons was a nonparty whose notes MacQuarie never subpoenaed. Thus, the prejudice the court identified—MacQuarie's inability to cross-examine Simmons regarding her notes—"was a self-inflicted wound" that was "entirely untethered from Franco's litigation conduct." But whether the court was required to make a finding of bad faith depends on whether the court imposed a sanction.

Here, the court admitted the hotel pad notes, that Simmons referenced at her first deposition. It also admitted her e-mail to her client dated February 24 that she referenced at her second deposition. <u>See</u> ER 901(10) (an e-mail is an illustration of satisfactory authentication). But the court excluded the loose-leaf notes Simmons had never specifically referenced during either deposition and did not produce until *after* her deposition testimony had been played for the jury. In other words, the court admitted the evidence Simmons had described, and thus authenticated, and excluded the evidence Simmons did not describe or otherwise authenticate. Requiring proper authentication to admit evidence is not untenable. ER 901; ER 902. And a court "should ordinarily rely on the [civil] rules" to control litigation conduct. <u>Fisons</u>, 122 Wn.2d at 340 n.72. The court asked the

parties to suggest a remedy, the least "severe sanction,"[20] and it followed the remedy ultimately proposed by and agreed to by Franco. Thus, the court did not impose a sanction, so it did not need to enter a finding of bad faith.[21]

Therefore, we conclude the court did not abuse its discretion because its decisions about which notes to admit and which to exclude were neither manifestly unreasonable nor based on untenable grounds.[22] See, e.g., Air Serv Corp. v. Flight Servs. & Sys., No. 71103-2-I, slip op. at 14 (Wash. Ct. App. Apr. 6, 2015) (unpublished), https://www.courts.wa.gov/ opinions/ pdf/711032.pdf (exclusion of witness was not a sanction where the court refused to allow the witness to testify remotely after it found the witness was not on vacation).[23]

### B. Impermissible comment and instructional error

Franco argues the court made an impermissible comment on the evidence because the "two actions" of "selectively" admitting Simmons's notes and the court's instruction describing Simmons's refusal to produce notes "stacked the

---

[20] Except for this one reference to a sanction, the court spoke in terms of a "remedy." Only Franco spoke in terms of a "sanction."

[21] The authority cited in Franco's reply brief does not help him. Carroll v. Akebono Brake Corp. involved CR 37, which Franco's opening brief conceded is not at issue here. See 22 Wn. App. 2d 845, 862, 514 P.3d 720 (2022), review denied sub nom. Carroll v. Nissan Motor Co., Ltd., 200 Wn.2d 1023, 522 P.3d 45 (2023).

[22] MacQuarie argues Franco had custody and control over Simmons's notes because Franco had the "practical ability" to obtain them. The case MacQuarie cites, Diaz v. Washington State Migrant Council, 165 Wn. App. 59, 78, 265 P.3d 956 (2011), does not support this argument because it defines "control" as "the legal right to obtain the documents" and places on the party seeking discovery the burden of proving "practical ability." Here, MacQuarie never suggests Franco subpoenaed Simmons's notes, which could have given it a legal right to obtain them. And the parties acknowledge the court did not have subpoena power over Simmons. For the same reason, while the court found MacQuarie was prejudiced by not having Simmons's notes with which to cross-examine her, it is undisputed that MacQuarie did not attempt to subpoena the notes, so we need not determine whether the court's finding of prejudice was "tantamount" to a finding of bad faith on Franco's part.

[23] Where necessary for a reasoned decision, this court may cite an unpublished opinion. GR 14.1(c).

27

deck against Simmons" and "effectively suggested that Simmons had been compelled to provide notes that contradicted her testimony." Br. of Appellant at 67-68.

Washington's Constitution, article 4, section 16, states that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." "A statement by the court constitutes a comment on the evidence if the court's attitude toward the merits of the case or the court's evaluation relative to the disputed issue is inferable from the statement." State v. Lane, 125 Wn.2d 825, 838, 889 P.2d 929 (1995). "The touchstone of error in a trial court's comment on the evidence is whether the feeling of the trial court as to the truth value of the testimony of a witness has been communicated to the jury." Id. We review jury instructions de novo to determine whether the trial court improperly commented on the evidence.[24] State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

The court's decisions about which notes to admit or exclude are not "[a] statement by the court." Lane, 125 Wn.2d at 838. As to the court's instruction itself, whether it was an impermissible comment depends on whether "the court's attitude toward the merits of the case or the court's evaluation relative to the disputed issue is inferable from the statement." Id. Here, the fact that Simmons did not produce the notes voluntarily was not disputed, so the court did not

---

[24] MacQuarie argues Franco waived this issue by not objecting below. But " '[s]ince a comment on the evidence violates a constitutional prohibition, [a] failure to object or move for a mistrial does not foreclose [him or] her from raising this issue on appeal.' " State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997) (quoting State v. Lampshire, 74 Wn.2d 888, 893, 447 P.2d 727 (1968)).

unconstitutionally charge the jury regarding a disputed fact. But Simmons's credibility *was* at issue, and MacQuarie used the court's instruction to further impeach her credibility in its closing argument.

In Lane, witness Blake testified about conversations he had in jail with two of the three defendants in a murder trial. 125 Wn.2d at 835. Blake's credibility was a key issue in the case. Id. at 837. Blake had previously worked for the police as a paid informant, and there was conflicting testimony about whether his reduced sentence and early release were based on his cooperation with police, which was revealed while Blake was in jail and placed him in jeopardy, or whether he made up the story in return for money and favorable treatment. Id. at 836. Therefore, before instructing the jury, the court read a statement regarding the reason for Blake's early release:

> "The sentence of William Blake was reduced to three months confinement and release date of June 8, 1988 given. The reasons advanced by the prosecutor and accepted by the judge related to Mr. Blake's safety and an inadvertent disclosure . . . of Mr. Blake's cooperation with authorities given to an unidentified person. Whether that last statement proves or does not prove anything is a matter for the jurors.
> Now instruction on the law. The testimony of Mr. Blake regarding prior statements of Mr. Anderson may be considered by you in determining Mr. Anderson's credibility and for no other purpose."

Id. at 837. The Washington Supreme Court in Lane agreed with the Court of Appeals that the trial court's remarks were an impermissible comment on the evidence, but that the error was harmless as to each defendant. Id. at 838.

By contrast, in Wuth ex rel. Kessler v. Laboratory Corp. of America, the trial judge's repeated statements that the parents of a child who was born with

29

severe birth defects were not at fault and had no legal liability were not impermissible comments on the evidence. 189 Wn. App. 660, 698, 359 P.3d 841 (2015). The parents' lack of fault was not disputed at trial, but the defendants nonetheless argued that the court's comments bore on their credibility. Id. at 700. The court disagreed: "the trial court merely articulated the basis for evidentiary rulings and appropriately instructed the jury on the use of evidence that was admissible for limited purposes." Id.; see also Smith v. Behr Process Corp., 113 Wn. App. 306, 335, 54 P.3d 665 (2002) (instructions and the verdict form "clearly reflect[ed] the trial court's opinion" as to disputed facts, but court resolved these issues in its default judgment, so they were not disputed issues at trial).

Here, the court's instruction provided no discernible instructive purpose regarding relevant law. Unlike the court's comments in Wuth, the court's instruction here was not merely a limiting instruction about the appropriate use of evidence. However, unlike the court's prefacing statement in Lane about the reason for Blake's early release, the court's instruction here is not an instruction regarding a disputed fact. See Lane, 125 Wn.2d at 839.

Franco contends that MacQuarie pointed to the hotel pad notes to argue Simmons fabricated the conversation with Handen. While MacQuarie's closing argument is not a comment by the court, it does underscore the problematic nature of the court's instruction. MacQuarie argued that Simmons's note did not corroborate her testimony, and it used the court's instruction to bolster this

argument—"the only way we got it was by court intervention."[25] MacQuarie's argument at closing thus draws into focus the possible inference from the court's instruction about Simmons's notes not being voluntarily produced.

Ultimately, however, any error in the instruction is invited error. The invited error doctrine "applies when a party takes an affirmative and voluntary action that induces the trial court to take an action that a party later challenges on appeal." Casper v. Esteb Enters., Inc., 119 Wn. App. 759, 771, 82 P.3d 1223 (2004) (witness's repeated attempts to violate the court's pretrial discovery rulings during his trial testimony caused the trial court to respond in the manner that later was claimed to be error). Here, after extensive discussion by both parties and the court about possible remedies regarding the late disclosure of Simmons's notes, counsel for Franco stated, "There can be an instruction that [Simmons] didn't voluntarily produce them [i.e., the notes]. That's fine." Counsel for MacQuarie stated his desire and intent to make the argument he made at closing, and counsel for Franco stated he had "no problem with [the instruction's language], Your Honor, given the circumstances." We therefore conclude that the court did not sanction Franco, and its instruction, while inappropriate, was not an impermissible comment on the evidence.[26]

---

[25] Franco also argues that the court compounded its error by barring Franco from explaining that the admitted notes related to an earlier conversation between Simmons and an HMS bondholder. In fact, the court sustained MacQuarie's objection to Franco mentioning "different notes" in his closing argument because Franco had promised he "won't say that there were other notes out there." The court ruled on this issue of admissibility after extensive argument. Sustaining MacQuarie's objection was not an abuse of discretion.

[26] Harmless error analysis applies to the constitutional error of a judicial comment on the evidence. Lane, 125 Wn.2d at 839. If a trial judge's conduct or remarks constitute a comment on the evidence, a reviewing court will presume the comments were prejudicial, and the party with

C. Franco's RAP 9.13 motion

After he appealed, Franco filed a RAP 9.13 motion with this court to review a trial court order denying his motion to supplement the record with Simmons's "loose-leaf" notes, which the trial court excluded.[27] Under RAP 9.13, "[a] party may object to a trial court decision relating to the record by motion in the appellate court." A commissioner of this court permitted Franco to file the notes "[s]olely for purposes of this Court's consideration of appellants' argument."

Here, Franco argues that seeing the excluded notes is not necessary to conclude that the sanction lacked a basis in either law or fact, but the notes do "further underscore" the harm and prejudice to him. MacQuarie's brief makes no argument as to the motion, which Franco argues weighs in favor of granting it. We deny the motion because the descriptions of Simmons's notes in the record as designated and the verbatim transcript—both the admitted hotel pad notes and the excluded loose-leaf notes—are sufficient to enable our review of the assigned error.

---

the burden of proof must show that no prejudice resulted unless it affirmatively appears in the record that no prejudice could have resulted from the comment. Id. at 838-39 (internal citations omitted). This is the same analysis as in a criminal case. See State v. McPhail, 39 Wash. 199, 202, 81 P. 683 (1905). While there do not appear to be any Washington civil cases in which a reviewing court determined that the court below had made an impermissible comment on the evidence and then proceeded to a harmless error or prejudice analysis, here the court's instruction referred only to Simmons's notes, and, at most, the jury could have inferred that her notes were harmful to her deposition testimony. But the jury saw the hotel pad notes Simmons referenced in her testimony. And the jury was instructed that "[y]ou are the sole judges of the credibility of each witness, and of the value or weight to be given to the testimony of each witness." Juries are presumed to follow the court's instructions. State v. Grisby, 97 Wn.2d 493, 509, 647 P.2d 6 (1982).

[27] Franco's RAP 9.13 motion also addressed e-mails between the parties and the court below. However, Franco withdrew his motion as to any documents other than the notes.

### IV. Attorney-Client Privilege and Perisho's Investigation

Perisho is an employment attorney who was hired by the two independent directors of HMS to investigate Franco's alleged misconduct, which was first raised in AlixPartners' report. During discovery, MacQuarie asserted privilege as to Perisho's report to the directors and certain communications relating to his investigation, but produced other documents relating to his retention, the scope of his investigation, and his interactions with Franco and his attorneys. Before trial, Franco moved to exclude any evidence withheld during discovery under a claim of privilege, particularly all evidence relating to Perisho and his investigation of Franco.

The court distinguished between evidence of an investigation and the fact that Perisho interviewed Franco. It ruled that MacQuarie "may state that Mr. Perisho interviewed Mr. Franco" but could not "argue or have witnesses state that the investigation was conducted by independent directors." The court reasoned that because Franco had a negative view of the Alix Partners report, MacQuarie could introduce evidence that they tried to remedy this by hiring Perisho.

Accordingly, at trial, Perisho was not a witness, and no evidence of the substance of his advice to the independent directors was offered. However, Franco advised the court he intended to call the attorney who represented Franco during Perisho's investigation, Kornfeld, to testify about Perisho's interview of Franco. The court noted that redacting the word "investigation" from exhibits the parties used in examining Kornfeld might be confusing. The court

suggested that the word "investigation" be replaced with the word "interview" in the documents. Although Franco had objected to admission of this evidence pretrial, at this point both parties agreed to the redactions and alterations and both parties questioned Kornfeld about Perisho's interview of Franco.

At closing argument, in discussing the fact that Franco had been fired a second time by the independent directors, MacQuarie invited Franco's counsel to explain "how the heck [the directors] came – and Perisho and everybody else came to the same conclusion, that [embezzlement] was grounds for termination." MacQuarie further argued to the jury that "[t]he independent directors who interviewed him found multiple instances of highly inappropriate behavior. Multiple instances."

Franco challenges the court's ruling admitting evidence that Perisho interviewed Franco, arguing that the attorney-client privilege "may not be used as both a sword and shield," citing Pappas v. Holloway, 114 Wn.2d 198, 208, 787 P.2d 30 (1990). MacQuarie argues that Franco's argument is barred by either waiver or invited error and his shield and his sword argument is "not implicated." We conclude that the court did not abuse its discretion by excluding evidence of materials that were designated as privileged when produced.

The attorney-client privilege applies to communications and advice between an attorney and client and extends to documents that contain privileged communications. Pappas, 114 Wn.2d at 203. Its purpose is to encourage free and open attorney-client communication by assuring the client that communication will not be disclosed. State v. Chervenell, 99 Wn.2d 309, 316,

34

662 P.2d 836 (1983). The privilege "must be strictly limited to the purpose for which it exists" because its application may result in the exclusion of evidence that is otherwise relevant and material. Dike v. Dike, 75 Wn.2d 1, 11, 448 P.2d 490 (1968).

The privilege is not absolute and is subject to recognized exceptions. Id. at 11. One such recognized exception occurs when an attorney's client sues the attorney for legal malpractice. Pappas, 114 Wn.2d at 204. For example, in Pappas, an attorney, Pappas, sued former clients, the Holloways, to recover fees, and the Holloways filed a counterclaim for legal malpractice. Id. at 200. Pappas then filed third-party complaints against all other attorneys who had represented the Holloways in the same litigation. Id. at 201. The court affirmed a trial court ruling compelling the third-party defendant attorneys to produce documents protected by the attorney-client privilege because their former clients, the Holloways, had sued Pappas for legal malpractice and could not "at the same time conceal from him communications which have a direct bearing on this issue." Id. at 208. To rule otherwise, the Pappas court wrote, "would in effect enable [the Holloways] to use as a sword the protection which the Legislature awarded them as a shield." Id. This situation is sometimes referred to as "waiver by implication." Bittaker v. Woodford, 331 F.3d 715, 719 (9th Cir. 2003).

Pappas and Bittaker are both distinguishable. In both of those cases, claims were made that put an attorney's performance at issue. In Pappas, the defendants counterclaimed that Pappas committed legal malpractice, and in Bittaker, the defendant claimed ineffective assistance of counsel. In contrast,

Franco's argument is about waiver by implication: he argues the court "effectively authorized a partial waiver of the attorney-client privilege, thus turning the doctrine on its head."

But the court here authorized no such waiver. And the test for whether the party asserting a privilege has impliedly waived it requires examining whether the "(1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." Pappas, 114 Wn.2d at 207 (citing Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975)).

Here, MacQuarie is the party asserting the privilege but not the party that filed suit. Nor is MacQuarie the party who made the information at issue relevant; Franco did that by alleging the AlixPartners' report was flawed. And finally, Franco does not argue the report was vital to his defense; rather, he argues MacQuarie "could not have so easily argued" that the independent directors ratified the earlier decision to terminate Franco, so "the jury may have found" the defendants breached their duty by ousting him. Thus, MacQuarie did not waive the privilege by implication, nor did the court authorize any "partial waiver."

Perisho did not testify, and the substance of his advice to the independent directors was never before the jury.[28] The court, in fact, would not permit even

---

[28] The fact that the court did not admit the privileged investigation distinguishes two federal district court cases Franco also cites in support. In Merisant Co. v. McNeil Nutritionals,

the mention of the word "investigation." We therefore conclude that the court did not abuse its discretion by excluding evidence of the Perisho investigation MacQuarie identified as protected by the attorney-client privilege during discovery.[29]

## CONCLUSION

The trial court did not err by directing the verdict on Franco's defamation and tortious interference claims in the MacQuarie defendants' favor. It properly refused to give an erroneous instruction regarding Delaware's fiduciary duty law. The court did not abuse its discretion by deciding which of Carol Simmons's notes to admit and which to exclude, and these decisions were not a sanction. The court's instruction regarding Simmons's notes, while inappropriate, was not an impermissible comment on the evidence. Finally, the court did not abuse its discretion by properly excluding evidence MacQuarie had identified as privileged.

Affirmed.

_Cheng, J._

---

LLC, the court declined to rule on the issue and its discussion involved introducing a privileged document as evidence. 242 F.R.D. 303, 311 (E.D. Pa. 2007). And United States v. Town of Oyster Bay reinforces that "a party who stands behind its asserted attorney-client privilege, and refuses to produce the opinions of its counsel, is precluded from introducing the information at trial," which is what happened here. No. 14-CV-2317, 2022 WL 34586, at *3 (E.D.N.Y. Jan. 3, 2022), aff'd as modified, No. 14-CV-2317, 2022 WL 4485154 (E.D.N.Y. Sept. 27, 2022).

[29] MacQuarie also argues Franco's arguments are barred by waiver and invited error. As we have decided the issue on the merits, we do not address these arguments.

No. 84292-7-I/38

WE CONCUR:

Díaz, J.                          Smith, C.J.
_____              _____